546 So.2d 410 (1989)
Denis RETY, Appellant/Cross Appellee,
v.
Arthur GREEN and Southern Commodity Corporation, Appellees/Cross Appellants.
Nos. 86-1860, 86-1861.
District Court of Appeal of Florida, Third District.
February 14, 1989.
On Rehearing August 1, 1989.
*413 Kelly, Black, Black, Byrne & Beasley and Hugo Black, Jr. and Lauri Waldman Ross, Lisa Bennett, Miami, Chonin & Sher, Coral Gables, Shafran & Martin, for appellant/cross appellee.
Daniels & Hicks and Mark Hicks and Ralph O. Anderson, Miami, and Joseph C. Brock, New York City, Kimbrell & Hamann; Cooper, Wolfe & Bolotin and Marc Cooper, Miami, for appellees/cross appellants.
Before SCHWARTZ, C.J.[*], and HUBBART and BASKIN, JJ.
HUBBART, Judge.
This is an appeal by the plaintiff Denis Rety from two post-trial orders entered in a defamation action after the jury had returned a verdict in his favor. The post-trial orders appealed from are: (1) a remittitur or new trial order on the issue of damages, and (2) a new trial order on all issues entered after the plaintiff refused the remittitur. This is also a cross appeal by the defendants Arthur Green and Southern Commodity Corporation from certain adverse trial court rulings made in the cause. For the reasons which follow, we (a) affirm the remittitur or new trial order, save for the reduction of the punitive damages award which is reversed in part, (b) reverse the new trial order in its entirety, (c) affirm the trial court rulings under review on the cross appeal, and (d) remand the cause to the trial court with directions.

I
The relevant facts of the case are these. On the evening of September 18, 1982, the defendant Arthur Green was dining out at a first-class French restaurant, La Belle Epoque, located in Bay Harbor Islands, Dade County, Florida. The plaintiff Denis Rety owned and operated this restaurant through a corporation in which he held all the corporate stock.[1] During the evening, the defendant Green became aware of an incident at a nearby table at the restaurant involving some acquaintances of his. This incident, in turn, led to a series of incredible events in the days and months that followed which were to change forever the *414 lives of both the plaintiff Rety and the defendant Green. Indeed, a Thomas Hardy novel might very well be constructed out of these bizarre events, as they show how perverse and tragic life can sometimes be when people are swept away by the madness of their emotions.

A
The precipitating incident at the La Belle Epoque restaurant was innocuous enough. Green's acquaintance complained to the restaurant waiter and later to the plaintiff Rety about an allegedly tough veal chop; Rety told the acquaintance that although there was nothing wrong with the veal chop, the latter was welcome to order another dish in view of this dissatisfaction. The defendant Green did not overhear any of this conversation and was aware only that his acquaintance appeared upset over something. The next day, however, Green learned from his acquaintance what had happened the previous evening. Although not personally involved in the incident, Green took it upon himself to send a handwritten note to the restaurant complaining about the above affair as if he had actually witnessed it  which, in fact, he had not. Moreover, he totally distorted the incident by portraying it as an "argument" in which the restaurant management had refused any satisfaction to the patron  which, in fact, was also not true. He ended the note by deprecating the restaurant as catering "to the condo crowd with their desire for medium-priced food, and medium-priced quality."
The plaintiff Rety was greatly angered when he received the above note and telephoned Green personally to express his extreme displeasure. After identifying himself, Rety denied that there had been any such "argument" at his restaurant and stated that he did not need Green to tell him how to run his business. The conversation thereupon turned into a heated argument, the details of which were disputed at trial. According to Rety's version, which the jury accepted, Green called Rety a "Crazy Frenchman," to which Rety replied, "I don't know what you are, a crazy German, crazy Italian, crazy Jew, but I am sure you are more crazy than I am"; Green then began to scream at Rety, at which time Rety hung up the telephone. Green's version of the exchange  which the jury rejected, presumably because he gave various contradictory and widely different accounts of the same conversation to several other people  was that Rety threatened him and his children, cursed at him, and called him various anti-Semitic names. The telephone conversation lasted no more than two minutes.

B
After this fateful conversation, Green became greatly angered and sent another handwritten note to Rety in which he accused Rety of making anti-Semitic remarks during the above conversation. He called Rety a "very foulmouthed individual" and said, "I am letting all my friends and neighbors in Bay Harbor know your feelings about Jews. Since you hate them, there is no reason why they should patronize your establishment." Soon thereafter, Green dictated a letter to Rety on the stationery of his corporation, the defendant Southern Commodity Corporation, which he signed as president of the corporation; this letter became the basis of the instant defamation suit. After accusing Rety of making vile anti-Semitic slurs during the above telephone conversation, Green stated that he was going to do everything in his power to financially destroy Rety's restaurant and to run Rety out of town.[2]
*415 Green authorized release of the above letter after counsel for the defendant Southern Commodity Corporation had reviewed and approved it. The letter was, in turn, forwarded by carbon copy to various prominent leaders in the Jewish political and social community in the Bay Harbor Islands area.[3] Green also sent blind copies of his letter to various friends and relatives and had "maybe 50 conversations" with people concerning his "problem with Rety." The incident was even discussed with President Ronald Reagan at a meeting Green attended at the White House in November of 1982.
In the months that followed, Green's letter received wide circulation and publicity throughout the Bay Harbor Islands community and elsewhere. Original recipients of the letter forwarded their copies to others.[4] Stacks of the letter were present and available for distribution at the Miami Beach Chamber of Commerce. The letter was discussed at town hall in Bay Harbor Islands, at the local chapter of the Anti-Defamation League (which received numerous inquiries concerning same), and at many community organizations and social groups.[5] The letter was also circulated to prominent South Florida condominiums and apartment buildings.[6] It was even read to a bus load of American tourists in Israel on a Greater Miami Jewish Federation sponsored *416 trip in October 1982. Ironically, however, the letter was never mailed to Rety himself, although it was addressed to him; instead, three weeks after its original publication, Rety, quite by accident, received a copy of the letter from his landlady who had come upon one of the many copies in circulation at the time.

C
This widespread publication and republication of Green's letter had a devastating impact on Rety, both financially and emotionally. This was not surprising in view of the fact that Bay Harbor Islands was, and still is, a predominantly Jewish community; Rety's restaurant catered to a largely Jewish clientele; and Green himself was a well-known and respected member of the Bay Harbor Islands Jewish community.
In early October 1982, Rety and his family began receiving telephone threats (including death threats) at La Belle Epoque. At first, there were just a few calls, but they rapidly increased to the point that the phone was constantly ringing. Callers cursed and called Rety an "anti-Semite," threatened to blow up his restaurant, and warned that his family should not walk the streets.
Rety also received "hate" mail from various local and other sources. The South Florida Hotel and Motel Association, to which many Miami Beach hotels belong, initiated a letter-writing campaign about the incident; Michael Klein, one of its members, wrote Rety, as part of that campaign, that "[i]t is individuals like you that add to the misery in the world today." Incidents similar to this were repeated many times over.[7]
Rety further was ostracized from the local business community. The Gold Coast Chamber of Commerce [representing Surfside, Bal Harbour, Bay Harbor Islands, Sunny Isles, Golden Beach and North Bay Village] had been holding all of its monthly luncheon meetings at La Belle Epoque. After Green's letter circulated, the Chamber's executive board voted 16-0 to change to another restaurant because "based on what was going on, it was inappropriate to have meetings there." In an unprecedented move, the Board of Governors of the Miami Beach Chamber of Commerce voted to expel Denis Rety and La Belle Epoque from membership on November 16, 1982. Initiating this vote was Stephen Cypen, acting on the information he had received from Green. Cypen's motion was seconded by attorney Gerald Schwartz, another prominent Jewish community member, who was present on the tour bus in Israel when Green's letter was read.
Rety gave several press interviews in an attempt to stem the tide of community outrage against him, but to no avail. Cancellation of business, as well as individual reservations at La Belle Epoque came pouring in as the Jewish community boycotted Rety. More than sixty regular customers never returned to the restaurant again. A similar impact was also felt at the Continental Gourmet, Rety's second restaurant in Hollywood, Florida. Green admitted that he knew in advance that people would take this kind of action as a result of his charges as "it would be a natural consequence when someone reads a letter like this."
Statistical evidence was adduced at trial showing a drastic decrease in Rety's gross sales at La Belle Epoque. That evidence indicated a drop from $108,000 to $47,000 per month in winter, and from $45,000 to only $6,000 in summer. In the face of this *417 steady decline in business, Rety valiantly struggled to keep his restaurants open for approximately one year after the initial publication of Green's letter. With little money coming in, Rety was forced to work with a bare-bones staff, and do most of the work himself, routinely working eighteen-hour days. Despite these cost-cutting measures, Rety could not keep his restaurants going and was forced into bankruptcy. Prior to the Green letter, Rety reported an income range of $15,000-$30,000 in his income tax returns (1980-83); after the Green letter, he was stripped of virtually everything he had in South Florida.
Throughout this entire ordeal, Rety endured considerable mental anguish. From a well-established, honored and respected member of his community, he became a pariah. When he walked down the street in his neighborhood, people crossed the street to walk on the other side. He was deliberately slighted in public; for six months, he never slept more than two hours a night, and felt himself "falling apart." "[I]n one day over one letter," he had lost everything. In the end, he had to leave town. He and his family moved to New Orleans where, with $600,000 in borrowed capital and a small down payment, he purchased another restaurant. Fortunately for him, this restaurant is now doing relatively well financially.

D
The aforesaid devastation which Green wreaked upon Rety, however, was soon to bring considerable trouble to Green himself. Rety and his two corporate restaurants [in which he held all the corporate stock] brought a defamation action against Green and his corporation, the Southern Commodity Corporation, in the Circuit Court for the Eleventh Judicial Circuit of Florida. After numerous amended complaints and much pre-trial jousting, Rety proceeded to trial on his sixth amended complaint against Green and the Southern Commodity Corporation. The corporate restaurants were voluntarily dismissed from the lawsuit; La Belle Epoque, Inc., which was by then owned by Rety's former business partner, settled with the defendants over Rety's protest.
The case was tried before a jury below for nine days during which fifty-eight witnesses testified. The jury deliberated for approximately one hour and returned a verdict for the plaintiff Rety, awarding him (1) $10,000,000 in compensatory damages against Green and the Southern Commodity Corporation, (2) $10,000,000 in punitive damages against Green, and (3) $2,500,000 in punitive damages against the Southern Commodity Corporation  for a grand total of $22,500,000 in compensatory and punitive damages.
It is fair to say that the trial judge was stunned at this verdict, because, sua sponte, he entered a post-trial order of remittitur or new trial in which he reduced (1) the compensatory damage award against both defendants to $2,500,000; (2) the punitive damage award against Green to $50,000; and (3) the punitive damage award against the Southern Commodity Corporation to $500,000  for a grand total of $3,050,000 in reduced compensatory and punitive damages. The order stated that if the plaintiff Rety refused to accept this remittitur within ten days, a new trial would be granted as to damages only.
After Rety refused to accept this remittitur, the trial court granted the defendant's post-trial motion for a new trial on the issues of both liability and damages. The plaintiff Rety appeals from both the remittitur or new trial order and the new trial order. The defendants cross appeal from various adverse trial court rulings made in the case.

II
First, we will consider the trial court order of remittitur or new trial under review. For the reasons which follow, we affirm this order, save for the amount of the remittitur ordered on the punitive damages against the defendant Green.

A
The law is well settled that a jury is accorded wide latitude in determining the amount of awardable damages, if any, in a *418 civil action which, as here, is otherwise triable by jury. This is especially true of punitive damage awards which are "peculiarly left to the discretion of the jury as the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression or outrage found by the jury from the evidence." Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 221-22 (1936).
A jury's wide-ranging authority to determine these damages, however, is not an unbridled one and has long been subject to limited trial court superintendence through the post-trial order of remittitur or new trial. The underlying rationale for such limited superintendence is to prevent so-called haywire or runaway jury verdicts from standing. The law is, therefore, well settled that although "the trial judge does not sit as a seventh juror with veto power," over the size of a jury verdict and "may not substitute [his or her] judgment for that of the jury on the matter of damages," still the said judge has the duty to enter a post-trial order of remittitur or new trial "when the record affirmatively shows the jury's verdict to be excessive [i.e., against the manifest weight of the evidence] or when the judge makes [supportable] findings concluding that the jury was influenced by something outside the record." Arab Termite & Pest Control, Inc. v. Jenkins, 409 So.2d 1039, 1041, 1042 (Fla. 1982); see Laskey v. Smith, 239 So.2d 13, 14 (Fla. 1970). This determination necessarily requires the trial judge to "consider the credibility of the witnesses along with the weight of all of the other evidence" and to enter such order "when the manifest weight of the evidence dictates such action." Smith v. Brown, 525 So.2d 868, 870 (Fla. 1988). "Although an order of new trial need not incant language to the effect that the verdict is against the manifest weight of the evidence or was influenced by considerations outside the record, the order must give reasons which will support one of these two conclusions so that it will be susceptible of appellate review." Wackenhut Corp. v. Canty, 359 So.2d 430, 435 (Fla. 1978).
In reviewing such a post-trial order on appeal, the law has long given considerable deference to the trial court's decision in the matter because of the unique vantage point which the trial court has to personally observe the witnesses and jury and to assess the credibility and manifest weight of the evidence  as opposed to the appellate court which has only a cold record to review. Consequently, the law is well settled that "[t]he appropriate standard of review of a trial court's order granting, alternatively, remittitur or a new trial where the trial court has given its express reasons for its order ... is whether there has been a clear showing of abuse of discretion on the part of the trial court." Winn-Dixie Stores, Inc. v. Robinson, 472 So.2d 722, 725 (Fla. 1985) (emphasis added). In this connection, "the appellate court should apply the reasonableness test to determine whether the trial [court] abused [its] discretion," namely, whether "reasonable [people] could differ as to the propriety of the action taken by the trial court... ." Baptist Memorial Hosp., Inc. v. Bell, 384 So.2d 145, 146 (Fla. 1980).
It should be borne in mind, however, that the trial court itself has a limited discretion to interfere with a jury verdict, as stated above, and must give due deference to the jury's broad discretion to fix compensatory and punitive damages.[8] It therefore follows that if reasonable people could differ as to whether the trial court properly exercised its above-stated limited discretion to grant a remittitur or new trial, "there can be no finding of an *419 abuse of discretion" by the trial court and the order must be affirmed; on the other hand, if reasonable people could not so differ and would necessarily conclude that the trial court did not properly exercise its limited discretion, there has been a clear showing of an abuse of discretion by the trial court and the order must be reversed. Id.; see Smith v. Brown, 525 So.2d at 870.
We fully recognize that the above standards of review are principled in nature and are not subject to mathematical application. A reasoned judgment based on these principled standards is necessarily required on the part of both the trial court and the appellate court. This is hardly surprising because open-and-shut rules would be entirely unworkable in this area and no doubt would lead to considerable injustice. The underlying purpose, however, behind these standards of review is to allow juries considerable leeway in assessing compensatory and punitive damages without giving them a blank check. Limited authority is therefore accorded to the trial court to check the occasional haywire or runaway jury verdict, without, in turn, giving the trial court a blank check to do so. Deferential review of the trial court's decision to intervene and reduce such a jury verdict is therefore given to the appellate court. Obviously, these standards stand somewhat in tension with one another and often call for delicate decisions on the part of the trial and appellate courts. See Montgomery Ward & Co. v. Pope, 532 So.2d 722, 722-24 (Fla. 3d DCA 1988) (Schwartz, C.J., dissenting).

B
In the instant case, the trial court gave very specific reasons for entering the remittitur or new trial order under review. We have no problem whatever in concluding that these reasons not only justified, but compelled the trial court to exercise its limited discretion to interfere with this grossly excessive verdict. Indeed, we would have been compelled ourselves to upset this jury verdict based on excessiveness if the trial court had not entered such an order. It is only in the amount of the remittitur ordered on the punitive damage award against the defendant Green that we find a clear abuse of discretion on the part of the trial court.
Essentially, the trial court concluded in the order under review that the total amount of the jury's verdict, $22,500,000, was "so grossly excessive and contrary to the manifest weight of the evidence as to shock the conscience of the [c]ourt." This is almost a self-evident conclusion because no libel verdict in the state or in the country has ever been upheld which even remotely approaches the amount of compensatory and punitive damages awarded in this case. The trial court noted in its order that "the verdict exceeded by two and one-half million dollars the amount sought by the [p]laintiff"; that "[the] [p]laintiff has established a new restaurant business [in New Orleans] which is extremely successful and, therefore, negates lasting damage to [p]laintiff's reputation"; and that the "emotional issues" inherent in the case "inflamed the passions and prejudices of the jury." In essence, the trial court reasoned that the $10,000,000 in compensatory damages was simply not proven at trial, and that $12,500,000 in punitive damages bore "no reasonable relationship to the malice, outrage or wantonness of the defamation as portrayed from the evidence." We find no clear abuse of discretion in this reasoning.
Having said this, however, we hasten to add that we agree with much of what the plaintiff Rety has argued in his brief on this point. We agree that the evidence below established an "unprecedented" case of libel against the defendant Green which deserved an unprecedented award of damages. The jury was clearly entitled to believe, based on this record, that the defendant Green, for no reason whatever, maliciously set out to destroy the plaintiff Rety's restaurant business, his social life, and his reputation in the community by attributing completely fabricated anti-Semitic statements to Rety in the letter sued upon  and that Green brilliantly succeeded in his calumny and literally destroyed Rety's reputation in the Bay Harbor *420 Islands community, forcing Rety to flee the area after his two restaurants were financially ruined by Green's defamatory letter. Undoubtedly, Rety was entitled to an unprecedented compensatory and punitive damage award so as to fit "the vicious arrogance of the defendant's conduct, and the life shattering damage inflicted intentionally with malice aforethought." Appellant's brief at 25.
The law is well settled that:
"Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred... . Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."
Gertz v. Robert Welch, Inc., 418 U.S. 323, 349-50, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789, 810-11 (1974). Moreover, extensive punitive damages are also awardable in a libel action where, as here, the defendant maliciously publishes the libel with knowledge of its falsity and with deliberate intent to financially and socially ruin the plaintiff. W. Prosser & W.P. Keeton, The Law of Torts § 116A, at 845 (5th ed. 1984); Bobenhausen v. Cassat Ave. Mobile Homes, Inc., 344 So.2d 279, 282-83 (Fla. 1st DCA 1977).
Nonetheless, it should be clear beyond any doubt that $10,000,000 in compensatory damages and $12,500,000 in punitive damages is a haywire or runaway jury verdict which is not sustainable under any reasonable view of the evidence. At the very least, the trial judge with his unique vantage point was entitled to conclude that the damage award herein was against the manifest weight of the evidence and was the product of prejudice and passion  inasmuch as reasonable people could surely differ as to the propriety of such action. Although the plaintiff was reasonably entitled to unprecedented damages for this unprecedented libel, he was clearly not entitled to the instant award which we are informed is nearly twenty times higher than any libel verdict which has ever been upheld on appeal in Florida or elsewhere.
Moreover, we conclude that no clear abuse of discretion is shown in the amount of the remittitur ordered by the trial judge as to the compensatory damages award. The trial court could have reasoned, as it did, that the highest amount of compensatory damages which the jury could have awarded was $2,500,000 against both defendants herein. This amount, in itself, represents an unprecedented award which fits the unprecedented nature of the damages sustained by the plaintiff without constituting an obviously excessive amount. Stated differently, we think reasonable people could differ as to the amount of the compensatory damages remitted, and, accordingly, such remittitur must be sustained. We are mindful, that "[a trial] court is never free to reduce a verdict, by remittitur, to that amount which the court itself considers the jury should have allowed. It can only be reduced to the highest amount which the jury could properly have awarded." Lassitter v. International Union of Operating Eng's, 349 So.2d 622, 627 (Fla. 1976). We conclude, however, that $2,500,000 in compensatory damages is the highest amount which the jury could have properly awarded in this case.
We have some difficulty, however, in sustaining the amount of the remittitur ordered as to the punitive damage award. The trial court decided to reduce the punitive damages against the defendant Green from $10,000,000 to $50,000 and against the defendant Southern Commodity Corporation from $2,500,000 to $500,000, based primarily on the ground that these damages amounted to "economic castigation." The court reached this conclusion on the asserted basis that "[t]he sole evidence as to said [d]efendants' net worth was to the effect that Green had a negative two and one half million dollar ($2,500,000) net worth" and that the Southern Commodity Corporation was "in bankruptcy." The fatal flaw in *421 this reasoning is that the jury could have summarily rejected this evidence because its credibility, to say the least, was greatly suspect.
The defendant Green, whom the jury found was unworthy of belief in this affair, testified concerning his alleged indebtedness and that his corporation was bankrupt; he proffered, however, no CPA audit, no income tax returns, nor any other records or documentary proof to corroborate this testimony. Plainly, the jury was not required to accept Green's self-serving cries of poverty, especially when other evidence from a former employee of Green's showed that the corporate defendant's gross sales in 1984 were from $60-$70 million dollars. Moreover, contrary to the trial court's conclusion, the defendants had the burden of establishing what their net worth was in order to later make an "economic castigation" claim as to the punitive damages awarded; the plaintiff had no burden to establish that the defendants had the financial ability to pay a punitive damage award.[9]
It therefore follows that the trial judge's decision to reduce the punitive damages assessed against Green to a mere $50,000 was a clear abuse of the trial court's limited discretion to interfere with a punitive damages award. No reasonable person could have concluded that this award amounted to "economic castigation" under the circumstances of this case, and, accordingly, this remittitur cannot stand. We further conclude that the highest amount of punitive damages that the jury could have reasonably awarded on this record  given the incredible malice shown by Green in publishing the libel sued upon and the life-shattering damage which he intentionally inflicted on Rety  is $2,500,000, which amount we think represents the maximum appropriate punishment against Green for his conduct. Lassitter.
We do not disturb, however, the amount of the punitive damages remittitur ordered as to the defendant Southern Commodity Corporation which reduced such damages to $500,000. This amount, we think, represents the highest amount of punitive damages the jury could reasonably award, given the lesser culpability of the corporation as opposed to Green himself; at the very least, reasonable people could differ over this matter, and, therefore, no clear abuse of discretion is shown. For the reasons stated above, however, we do not sustain this remittitur based on the "economic castigation" ground relied on in part by the trial court. Lassitter.

C
In sum, then, we affirm the remittitur or new trial order under review, save for the amount of the remittitur ordered as to the punitive damages awarded against the defendant Green; this amount of the aforesaid remittitur is reversed, and the cause is remanded to the trial court with directions to enter a remittitur of $7,500,000 as to this award so that the remitted punitive damage award against Green is $2,500,000. Because we are reversing this aspect of the remittitur or new trial order, the trial court *422 shall, upon receipt of this court's mandate, give the plaintiff Rety a reasonable time within which to accept or reject the aforesaid remittitur as modified or be subject to a new trial on damages.[10]

III
Second, we turn to the trial court order which directs a new trial on the issues of both liability and damages. This order is primarily based on four alleged "prejudicial errors" committed during the course of the trial below. There is also a secondary basis stated in the order which concludes that a new trial was called for after the plaintiff refused the previously ordered remittitur. For the reasons which follow, we reverse this order in its entirety.

A
As to the alleged "prejudicial errors" committed at trial, the law is clear that
"if a trial judge, from his superior vantage point, grants a new trial in respect to a preserved error, we will reverse his order [on appeal] only upon a finding that he abused his discretion, even though had we reviewed that same preserved error on appeal, we, from our vantage point, might have decided that the error was not worthy of reversal and new trial. But where the trial judge grants a new trial on the ground of an unpreserved error, he is not operating within the area of his discretion, and his ruling will be upheld only if the error is, as a matter of law, fundamental."
Sears Roebuck & Co. v. Jackson, 433 So.2d 1319, 1322-23 (Fla. 3d DCA 1983) (citation omitted). Moreover, it is well settled that
"[t]he broad discretion of a judge in granting a new trial becomes limited and is drained of force when the question of the propriety of the granting of the new trial is one of law, and relates to the legal sufficiency of the ground or reason for granting the new trial."
Bishop v. Watson, 367 So.2d 1073, 1077 (Fla. 3d DCA 1979).
Although the plaintiff makes a substantial showing that some or all of the alleged four "prejudicial errors" were unpreserved errors, we will assume without deciding that all such alleged errors were properly preserved for new trial review by the trial court.[11] We conclude, however, that the trial court clearly abused its discretion in granting a new trial based on these alleged errors.

1
Contrary to the trial court's conclusion, three of the alleged "prejudicial errors" were not errors at all. (a) The character witness testimony offered by the plaintiff in his case-in-chief to the effect that the defendant Green had a bad current reputation for truth and veracity was highly relevant, and therefore admissible, as to the central defense raised by Green at trial, namely, that Green had told the absolute truth in the letter sued upon. Character witness testimony of this sort is clearly admissible in a defamation action when, as here, the defendant raises truth as a defense in the cause.[12]
*423 (b) The defendant Green's financial statement was clearly admissible in its entirety because evidence of such financial worth is highly relevant to and may be considered by the jury in its determination of the amount of punitive damages to be awarded.[13] Although the trial judge did not admit the financial statement for the purpose of establishing Green's net worth, it should clearly have done so, and it was error to conclude that any portion of the statement was inadmissible. The trial court further stated that the probative value of the statement was outweighed by its prejudicial impact because Green impliedly admitted in this statement that he had a $10,000,000 "contingent liability" for the "legal claim" in this case. The fatal flaw in this reasoning is that this entry merely represents Rety's asserted claim against Green, and is, in no sense, an admission by Green that the asserted claim was meritorious; a "contingent" liability, by definition, is dependent on the occurrence of some future and uncertain event, and, in this context, is nothing more than a statement of a disputed claim. Black's Law Dictionary 291 (5th ed. 1979). This being so, the aforesaid entry was in no way prejudicial to Green.[14]
(c) Evidence establishing that the gross sales at La Belle Epoque dropped off drastically as a result of Green's defamatory letter was clearly admissible because it is well settled that a person may recover consequential business damages for a defamation, which, as here, tends to be prejudicial to him in the conduct of his trade or business or to deter third persons from doing business with him.[15] Clearly, Green's defamatory letter directly libeled Rety, who, as the 100% stockholder in La Belle Epoque, Inc., was entitled to show that the sales at the said restaurant drastically fell off as a result of the libel leveled against him, and that ultimately this led to the financial ruin of the restaurant which rendered his corporate stock in the restaurant worthless. These were all Rety's individual business damages suffered as a result of the libel leveled against him and were not solely confined to damages sustained by La Belle Epoque, Inc. Indeed, if anything, the trial court unduly restricted the proof on this issue by refusing evidence offered by Rety establishing the value of the restaurant which he lost as a result of defamation sued upon.[16]

2
We agree that the fourth "prejudicial error" was a technical error, but conclude that it was a clear abuse of discretion for the trial judge to find that this error actually prejudiced the defendants in any sense. The trial court's jury instruction on apparent agency  which related solely to the liability of the defendant Southern Commodity Corporation for the act of its *424 corporate president Green in publishing the defamatory letter sued upon  inaccurately states that an apparent agency may be created by the words and conduct of the agent.[17] It is difficult to understand, however, how this technical error could have affected the outcome of this case under any reasonable view of this record. The evidence presented at trial showed that corporate counsel for the defendant Southern Commodity Corporation specifically reviewed and approved the publication of the letter sued upon which was sent out on under its corporate letterhead and was signed by Green as its corporate president, thus giving Green actual corporate authority to publish the aforesaid defamatory letter. Any technical error in the apparent agency jury instruction could not have confused or deceived the jury when viewed in light of all the evidence and the other jury instructions given in the cause.[18] This being so, it was a clear abuse of discretion to order a new trial based on this technical error in the apparent agency jury instruction.

B
As for the remaining grounds stated in the new trial order, the trial judge clearly abused his discretion in ordering a new trial based thereon. First, the shortness of the jury's deliberations could not by itself, under any view of this record, justify a new trial especially in view of the near overwhelming evidence presented at trial in favor of the plaintiff. See, e.g., Segars v. Atlantic Coast Line R.R., 286 F.2d 767, 770 (4th Cir.1961). Second, it is not per se improper for one jury to determine liability for punitive damages and another jury, on retrial, to determine the amount of punitive damages  at least in the absence of special circumstances, not shown here, such as changed proof as to the liability for punitive damages due to a prolonged delay in the aforesaid retrial. See Adler v. Seligman of Fla., Inc., 438 So.2d 1063 (Fla. 4th DCA 1983). Third, although the liability and damage issues may, in part, require overlapping proofs, the issues of liability and damages were clearly separate in this case. A new trial on damages as required by the remittitur or new trial order did not automatically require a new trial on liability in a subsequent new trial order after the plaintiff refused the remittitur.

IV
Finally, we have no trouble in affirming the trial court rulings which are claimed as error on the cross appeal.

A
The central argument raised by the defendants on the cross appeal is that (1) the plaintiff Rety was a "limited public figure" for purposes of this case, and, therefore, the said plaintiff was required to prove that the defendant Green published the defamatory letter sued upon with "actual malice"  that is, with knowledge that the matters stated therein were false or with reckless disregard as to whether the said matters were false or not, Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Miami Herald Publishing Co. v. Ane, 458 So.2d 239 (Fla. 1984), and (2) the defamatory statements *425 made in the letter sued upon involved a matter of "public concern," and, therefore, the plaintiff Rety was required to prove the above-stated "actual malice" in order to recover punitive damages, even if the plaintiff Rety be considered a private person. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Based on this twofold argument, the defendants urge that the trial court erred in (1) granting the plaintiff's motion for partial summary judgment in which it was ruled that the plaintiff "is not a public figure and is a private individual for purposes of the defamation count," (2) instructing the jury on defamation and punitive damages, and (3) denying motions for directed verdict on liability and punitive damages. We disagree and affirm each of these rulings of the trial court in all respects.
First, it is clear beyond any doubt that the plaintiff Rety was not a "limited public figure" under Gertz prior to the instant controversy, and, consequently, "actual malice" was not required to be proved as an essential element in the plaintiff's cause of action. Rety was a private businessman who owned and operated an exclusive French restaurant in Bay Harbor Islands. He advertised his restaurant as do many other private businessmen, but he was in no sense a public personality. In particular, he did not "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." Gertz, 418 U.S. at 345, 94 S.Ct. at 3009. Indeed, he only became publicly prominent in the Bay Harbor Island community due to the widespread publication of Green's defamatory letter, and obviously a defendant in a defamation action cannot by his defamation make the plaintiff a limited public figure for First Amendment purposes; the said plaintiff, unlike this case, must be a limited public figure prior to the alleged defamation. The trial court therefore properly ruled throughout the case that Rety was "a private individual for purposes of the defamation count." See Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 n. 12 (D.C. Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).
Second, the issue involved in this case  namely, whether Rety uttered anti-Semitic statements to Green in a private telephone conversation  is hardly a matter of "public concern," and, consequently, the First Amendment does not require that "actual malice" be established in order to recover punitive damages. No contention was raised in the letter sued upon that Rety was practicing anti-Semitism in the operation of his restaurant by insulting or slighting his Jewish patrons in any way; the sole contention was that Rety made anti-Semitic statements in a private conversation with Green. This being so, no issue of "public concern" was raised by Green's defamatory letter. Dun & Bradstreet; Waldbaum. In any event, clear and convincing evidence of "actual malice" was adduced below to sustain a punitive damages award, and the jury was properly instructed with respect thereto.

B
The defendants have also raised numerous other arguments which we have carefully examined. None present reversible error.
There is no merit to the defendant Southern Commodity Corporation's contention that the trial court erred in denying its motion for a directed verdict on the theory it was not vicariously responsible for Green's defamatory letter. The letter was sent out on corporate stationery, was signed by Green as the corporation's president, and was specifically approved in advance by the corporation's counsel. Moreover, it was wholly reasonable for the jury to conclude that Green sent the letter, in part, for the business purpose of ingratiating his company with the Jewish business community by appearing as the corporate avenger of an alleged anti-Semite. Plainly, the corporation was vicariously responsible for the defamatory letter sued upon, and, inasmuch as Green was the corporation's president rather than a lower echelon employee, the corporation was liable for punitive *426 damages as well as compensatory damages. Bankers Multiple Line Ins. Co. v. Farish, 464 So.2d 530, 533 (Fla. 1985); Kent Ins. Co. v. Schroeder, 469 So.2d 209 (Fla. 5th DCA 1985).
The trial court also (a) properly allowed an amendment to the defamation count against the defendant Southern Commodity Corporation to correct a technical error therein because no prejudice to the said defendant was shown below; (b) correctly charged the jury that the corporate defendant would be liable if it was negligent in allowing or failing to prohibit Green from publishing his defamatory letter; and (c) properly denied the corporate defendant's motion for directed verdict on this theory, given the ample proof of at least negligence on the part of the corporation herein. Finally, we have considered and reject the balance of the defendants' contentions concerning the jury instructions given herein, as, in our view, none rises to the level of reversible error.

V
For the reasons stated above, we (a) affirm the remittitur or new trial order under review, save for the reduction of the punitive damages award as to the defendant Green which is hereby reversed in part and the cause is remanded to the trial court in accord with the reversal and remand directions stated in part IIC of this opinion, (b) reverse the new trial order under review in its entirety, and (c) affirm all the trial court rulings attacked on the cross appeal.
Affirmed in part; reversed in part and remanded with directions.

ON REHEARING
The defendants Arthur Green and Southern Commodity Corporation have filed a motion for rehearing, a motion for rehearing en banc, and a motion to certify; We deny the motion for rehearing and decline to grant the remaining motions. Although we believe that an extended discussion of each of the points raised in these motions is unnecessary, we deem one point appearing in the rehearing motions worthy of some comment.
The defendants contend that the trial court erred in entering the remittitur or new trial on damages order below because no remittitur of any type was permissible in this case, and that a new trial on both liability and damages was required, not one on damages only. This is so, urge the defendants, because the trial court found that the damages verdict was the product of prejudice and passion, which finding, it is said, requires a new trial on all issues, not a remittitur or new trial on damages only, based on the authority of Atlantic Coast Line R. Co. v. Moore, 135 Fla. 485, 181 So. 374, 378 (1938), as modified on reh. by 135 Fla. 485, 186 So. 210 (1938); and Eassa v. Palmer, 140 Fla. 835, 192 So. 410, 411 (1939). It is therefore urged that this court was in error in (1) upholding the remittitur order on compensatory damages as to both defendants, and (2) in increasing the remitted punitive damages as to the defendant Green  that the subject order should have been reversed by this court in its entirety and the cause remanded for a new trial on both liability and damages. This point, including the supporting authority, is raised by the defendants for the first time on this appeal. We reject the point as having no merit for two reasons.
First, this court has no jurisdiction to entertain the defendants' belated attack on the remittitur or new trial order. This is so because the defendants did not appeal or cross appeal from this order; on the contrary, both defendants urged in their briefs and oral argument before this court that this order should be affirmed in all respects. It is therefore patently obvious that the defendants may not now repudiate that position and launch an entirely new appeal or cross appeal from the subject order on a motion for rehearing. Leslie Bros. v. Roope, 108 Fla. 289, 148 So. 212 (Fla.), aff'd, 112 Fla. 734, 150 So. 804 (Fla. 1933); Cartee v. Florida Dept. of Health & Rehabilitative Servs., 354 So.2d 81, 83 (Fla. 1st DCA 1977); In re Certificate of N.Y. to Compel Attendance of Witness, 297 So.2d 865, 866 (Fla. 4th DCA 1974); Kerr v. Schildiner, 167 So.2d 798, 800 (Fla. *427 3d DCA 1964), cert. denied, 174 So.2d 32 (Fla. 1965).
Second, we have nonetheless reexamined our opinion in light of the Moore and Eassa cases, as we have no desire to be in conflict with Florida Supreme Court precedent, and conclude that these cases have no application to the instant case. In Moore and Eassa, the Court reversed a remittitur order and remanded the cause for a new trial on damages only based on its conclusion that the entire damages verdict returned by the jury was caused by prejudice, passion, favoritism or other improper nonrecord factors. Moore, 186 So. at 216-27; Eassa, 192 So. at 411. Obviously, these cases offer no support whatever for the defendants' contention that they are now entitled to a new trial on liability and damages; both cases in fact ordered a new trial on damages only, not, as claimed, a new trial on all issues. Id. In any event, the remittitur order in the instant case, unlike the remittitur orders in Moore and Eassa, was based on the ground that the damages verdict returned by the jury was so against the manifest weight of the evidence as to shock the conscience of the court, and was, in part, the product of passion and prejudice caused by the emotional issues inherent in tthe case, a perfectly proper ground for entering such an order. See Wackenhut Corp. v. Canty, 359 So.2d 430, 434 (Fla. 1978); Lassitter v. International Union of Operating Eng'rs, 349 So.2d 622, 627 (Fla. 1976); De La Vallina v. De La Vallina, 90 Fla. 905, 107 So. 339 (1926); see also Arab Termite & Pest Control of Fla., Inc. v. Jenkins, 409 So.2d 1039, 1043 (Fla. 1982). Indeed, most runaway or haywire jury verdicts on damages suffer from precisely such an infirmity  and it is this classic type of defective verdict which the remittitur order was designed to check. This being so, the Moore and Eassa decisions cannot possibly govern this case.
The defendant's motions for rehearing are denied; we decline to grant the remaining motions.
NOTES
[*] Chief Judge Schwartz participated in the decision, but did not hear oral argument.
[1] Rety also owned and operated another French restaurant, the Continental Gourmet, through a similar close corporation, La Seine, in Hollywood, Florida.
[2] The letter states in its entirety as follows:

"I was extremely shocked by your phone call yesterday, and more especially, your violent, anti-semetic [sic] comments. You and I have never met, and don't know each other, but you saw fit to call me `a dirty Jew bastard, a kike, and a rotten, stinking Jew' numerous times in our five minute phone conversation. You also stated that all Jews are alike, that they are out to get something for nothing and they all stink.
I can't imagine what evoked this type of filth from your mouth, since you called in response to a courteous note I dropped you, reflecting a minor incident that happened last Saturday night in your restaurant. I was mearly [sic] an observer, and hoped you would take my criticism as being constructive and friendly.
It is quite obvious you hate Jews and don't care to do business with them, so I am going to try my darndest to help you out. You can call me anything you like, but don't disparage my religion, and when you do, I get mad. Damned mad! I am going to see to it that you will regret your words. With such a violent hatred for Jews, why did you choose Bay Harbor, a predominantly Jewish community, for your business? You probably would enjoy doing business more in Iran or Syria, where the populous [sic] shares your views. I will not reduce to writing the other filth that came out of your mouth, as at this point, I do not care to repeat it, but, if called upon, I certainly will. The threats you made against my person also will not be taken lightly, as you promised to `punch me in my Jewish face.' I had my last fist fight when I was a child, but at this point, I would welcome the opportunity for you to attempt that. You said you knew where I lived and you knew where my business was, and you were going to get me. Again, I would welcome this confrontation. A man like you has no business in our community, especially catering to the public.
As a Vice President of Temple Israel of Greater Miami, one of the largest Jewish congregations in the United States, and as an active member of the Greater Miami Jewish Federation, a member of the Young Presidents Organization of Mt. Sinai Hospital, and as a Jew, I take great exception to you and all that you stand for, and I will not hesitate to use my contacts in all these organizations, plus my business and social contacts, to spread the word about you. Since you did not mask your feelings about me and about Jews in general, you certainly should not object to my letting other people know how you feel." (emphasis added).
[3] These persons included: (1) Arthur Teitlebaum, Southern Area Director of the Anti-Defamation League, B'Nai Brith; (2) Shepard Broad, a prominent attorney (Broad & Cassel) and founder of Bay Harbor Islands; (3) Stanley Goldsmith, the mayor of Bay Harbor Islands; (4) Martin Shapiro, a practicing Florida attorney and member of the Bay Harbor Islands Town Council; (5) John Rauch, a practicing Florida dentist and member of the Bay Harbor Islands Town Council; (6) Vivian Levinson, another Town Council member; (7) James Hauser; and (8) Harry Frohman (Green's acquaintances in the "veal chop incident.")
[4] New recipients of these copies included Irving Cypen, an attorney and former circuit court judge; Anna Bidone, Rety's landlady [who owned the building in which La Belle Epoque was housed]; Peter Cohn, President of the Gold Coast Chamber of Commerce (representing the municipalities of Surfside, Bal Harbour, Bay Harbor Islands, Golden Beach and North Bay Village); Norma Orovitz, a newspaper columnist specializing in Jewish causes and issues, and a co-trustee with Green on Temple Israel's Board of Trustees; and Anthony Nales, the town manager of Bay Harbor Islands.
[5] Green's letter was the focal point of discussion at a men's club meeting of the Jewish Home and Hospital for the Aged, at a luncheon of the South Florida Hotel and Motel Association, at a Broward County Hadassah group meeting (with 75 women present), and at the Westview Country Club.
[6] Copies of the letter were handed out to tenants at a 250-unit Bal Harbour apartment house; it was posted on bulletin boards at Hillcrest Condominiums in Hollywood and the Town and Country Apartments in Bay Harbor. It was mailed to all unit owners at the Winston Towers 300 Condominium (417 units) as well as posted on the premises. It was also discussed in the lobby of the Harbor House in Bal Harbour (400 units).
[7] Ilse Simonhoff, previously a frequent customer of La Belle Epoque, wrote Rety that "it is utterly disgusting to learn that outside of Hitler's Germany of 40 years ago that people like you actually exist." Former customer Ilsa Karger (Milford, PA), informed Rety that she had previously gone to La Belle Epoque each year on visiting Florida, but would no longer do so because she had "heard [Rety did] not wish the business of Jewish people." From Syracuse, New York, Ben Meltzer wrote that he had received a copy of Green's September 24 letter and that "Mr. Rety  You have trouble." Robert Levy (N.Y. City) had purchased a gift certificate for dinner at La Belle Epoque as a present for his parents. He wrote Rety that he had heard of "the establishment's view of Jewish people" and would "make sure that all my friends who visit Florida are made aware of your feelings." Levy's father promptly ripped up the gift certificate and wrote Rety that "Jewish people do not support you anymore."
[8] This aforesaid limited trial court discretion must be distinguished from the very broad discretion the trial court has in deciding such matters as child custody, alimony, child support, and division of property in a marriage dissolution action, Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980), or in passing upon a motion to continue a trial, Echols v. State, 484 So.2d 568, 572 (Fla. 1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986); Lusk v. State, 446 So.2d 1038, 1040 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984), or in setting aside a default. North Shore Hosp., Inc. v. Barber, 143 So.2d 849, 852 (Fla. 1962).
[9] "[E]vidence of financial worth is admissible [in a defamation action] and may be considered by the jury in its determination of the amount to be awarded as punitive damages, but evidence of worth is not a requisite to such award." Bould v. Touchette, 349 So.2d 1181, 1187 (Fla. 1977); Rinaldi v. Aaron, 314 So.2d 762, 765 (Fla. 1975). "To preserve his right to contend on appeal that an award of punitive damages is excessive, it is incumbent on the defendant to introduce evidence of his net worth, if evidence has not been introduced by plaintiff, and in the absence of such evidence an appellate court cannot say that an award of punitive damages is excessive in that it would bankrupt the defendant. Bould v. Touchette, 349 So.2d at 1187; Louisville & Nashville R. Co. v. Hickman, 445 So.2d 1023, 1028 (Fla. 1st DCA 1983)." Papcun v. Piggy Bag Discount Souvenirs, 472 So.2d 880, 882 (Fla. 5th DCA 1985).

It therefore follows that the trial judge was in error in excluding the plaintiff's expert testimony on Green's net worth which was offered in rebuttal at trial after the defendants had rested. Contrary to the trial court's conclusion, this evidence constituted proper rebuttal testimony and was not required to be presented in the plaintiff's case-in-chief. This erroneously excluded testimony on Green's extensive net worth further supports our conclusion that the trial judge clearly abused his discretion in reducing the punitive damages against Green to a mere $50,000 based on "economic castigation" grounds.
[10] Unlike Mendelson v. Mendelson, 341 So.2d 811 (Fla. 2d DCA 1977), relied on by the defendants, we are modifying on appeal the remittitur ordered by the trial court so as to increase the amount of remitted damages. This being so, we think, fairness and common sense dictate that the plaintiff be given an opportunity to accept or reject the remittitur as modified upon remand. We agree, however, that this would not be the case if we had sustained the remittitur or new trial order under review in its entirety. Id.
[11] We do, however, rely in part on the "two issue" rule in concluding that no prejudice to the defendant Southern Commodity Corporation is shown on this record as to the technical error in the trial court's jury instruction on apparent agency. Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181 (Fla. 1977); see infra note 17.
[12] § 90.405(2), Fla. Stat. (1987); M. Graham, Handbook of Florida Evidence § 405.2, at 232 (1987). Erp v. Carroll, 438 So.2d 31 (Fla. 5th DCA 1983), relied on by the trial court, is not on point because there, unlike the instant case, "the defendant's veracity was not relevant to any issue in the case being tried," id. at 35, and accordingly character testimony as to the defendant's bad reputation for truth and veracity was held inadmissible. Although the tort of slander was, inter alia, sued upon in Erp, there is no indication that the defendant raised truth as a defense in the action.
[13] Bould v. Touchette, 349 So.2d 1181 (Fla. 1977); Rinaldi v. Aaron, 314 So.2d 762 (Fla. 1975).
[14] Green may very well have been entitled to a limiting instruction to the jury, but made no such request below. Indeed, Green attempted to show at trial that this "contingent" liability had nothing to do with Rety's claim in this case. This further supports our conclusion that the aforesaid entry was not prejudicial to Green.
[15] Hartley & Parker, Inc. v. Copeland, 51 So.2d 789, 791 (Fla. 1951); Kilgore Ace Hardware, Inc. v. Newsome, 352 So.2d 918, 920 (Fla. 2d DCA 1977).
[16] The cases relied upon by the defendant Southern Commodity Corporation for the proposition that a corporate stockholder cannot recover the loss in value of his corporate stock for a tort committed exclusively against the corporation are inapplicable to this case. See, e.g., Martens v. Barrett, 245 F.2d 844 (5th Cir.1957); Alario v. Miller, 354 So.2d 925 (Fla. 2d DCA 1978); Fried v. Easton, 293 So.2d 87 (Fla. 3d DCA 1974); James Talcott, Inc. v. McDowell, 148 So.2d 36 (Fla. 3d DCA 1962). Unlike those cases, the action sued upon in this case was a defamation of Rety himself, the 100% stockholder in La Belle Epoque, Inc., and was not exclusively confined to a defamation of the corporation. This being so, Rety was entitled to recover for the loss in value of his corporate stock in La Belle Epoque, Inc. caused by this defamation and, as a link in the proof of this loss, could show the drastic decline in the restaurant's sales as a result of Green's defamatory letter. The fact that La Belle Epoque, Inc. may have voluntarily dismissed its own claim before trial cannot change this result.
[17] As the trial court correctly concluded in its new trial order, this was error because an apparent agency can only be created by the acts of the principal, not acts of the agent. See, e.g., Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A., 483 So.2d 775 (Fla. 3d DCA), rev. denied, 492 So.2d 1334 (Fla. 1986).
[18] Underwriters at LaConcorde v. Airtech Serv., Inc., 468 So.2d 386 (Fla. 3d DCA 1985), quashed on other grounds, 493 So.2d 428 (Fla. 1986); Seaboard Coastline R.R. v. Addison, 481 So.2d 3 (Fla. 1st DCA 1985); Yacker v. Teitch, 330 So.2d 828 (Fla. 3d DCA 1976). Moreover, under the "two issue" rule, it is impossible to demonstrate any prejudice in this technical error because (a) the jury could have found Southern Commodity Corporation vicariously responsible for Green's defamatory letter based on actual, rather than apparent authority; (b) a general verdict was returned in favor of the plaintiff; and (c) Southern Commodity Corporation voiced no objection to a general verdict form. Whitman v. Castlewood Int'l Corp., 383 So.2d 618 (Fla. 1980); Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181 (Fla. 1977); Gonzalez v. Leon, 511 So.2d 606 (Fla. 3d DCA 1987), rev. denied, 523 So.2d 577 (Fla. 1988).