612 So.2d 1092 (1992)
C & C TRUCKING COMPANY and Bill Lambert
v.
Fred SMITH.
No. 90-CA-0366.
Supreme Court of Mississippi.
December 17, 1992.
*1095 John A. Ferrell, Booneville, for appellant.
R.K. Houston, Bay Springs, for appellee.
Before the court en banc.
SULLIVAN, Justice, for the Court:
This appeal arises from a malicious prosecution case in the Circuit Court of the Second Judicial District of Jasper County, Mississippi. The jury returned a verdict in the amount of $25,000 actual or compensatory damages and $50,000 punitive damages in favor of Fred Smith (Smith) against C & C Trucking Company (C & C) and Bill Lambert (Lambert).[1] C & C and Lambert filed their motion for remittitur, or in the alternative, motion for new trial on the issue of damages only. They also filed their motion for judgment notwithstanding the verdict of the jury, or in the alternative, a motion for a new trial.[2] The trial court sustained the motion for JNOV in favor of Lambert on the ground that the jury was not informed of Lambert's net worth. The remaining motions of C & C and Lambert were overruled. Feeling aggrieved, C & C and Lambert appeal to this Court and assign the following as error:
1. Was the evidence of malice and want of probable cause legally insufficient to sustain a verdict against the defendants;
2. Was it contrary to law for the trial court to submit the issue of punitive damages to the jury when the proof showed C & C's worth to be zero; and
3. Was the verdict of $25,000 actual damages and $50,000 punitive damages against the overwhelming weight of the evidence and so grossly excessive as to be shocking, evincing bias, passion and prejudice?
Smith cross-appeals and assigns one error:
1. That the trial court erred in granting Lambert a JNOV on punitive damages.

FACTS
C & C is a Mississippi corporation, domiciled in Prentiss County. Prior to 1986 and early 1987, the corporation was engaged in the business of trucking various commodities from place to place intrastate and interstate. C & C corporate stock was owned equally by Thomas H. Comer, Jr., a practicing attorney, and Phillip Cole, then Chancery Clerk of Prentiss County. Lambert was an employee of and dispatcher for the corporation who, together with Johnny *1096 Duncan, discharged the responsibilities of day-to-day business operations.
In 1986, Smith owned a 1976 model Kenworth tractor with 44-foot refrigerated trailer used to transport commodities. Smith entered into a verbal lease agreement with Lambert who acted for and on behalf of C & C. Under the agreement, Smith leased his tractor and trailer to C & C and agreed to haul for them with C & C providing the contract and hauling permits. C & C also agreed to obtain insurance for Smith's tractor and trailer and deduct the premiums from Smith's accumulating income. Latrell Smith (Latrell), son of Smith, drove and operated the vehicle. On the night of October 5, 1986, Smith's truck was parked on the C & C parking lot. Sometime during the night, it was vandalized. According to Lambert:
Someone had broken into it and had used a screwdriver to attempt  to turn the ignition switch on and in doing so had destroyed the ignition switch itself and was unable to put the key into it. They had also opened the flap on it and had attempted to hot wire it and, in fact, there was wire there and, in fact, they had accomplished  they were able to crank it, and why didn't steal it, I don't know... .
Latrell discovered the entry and ensuing damage to the truck when he arrived at the C & C parking lot preparatory to departing with a load of processed imported Plum Rose hams scheduled for delivery in Alabama and Florida. Lambert and Latrell were able to get the truck running by hot wiring it and putting the truck on manual pump. Latrell left the C & C parking lot at approximately 1:00 o'clock on the morning of October 6 for the purpose of making the contractual deliveries. The testimony of the parties concerning subsequent events are for the most part irreconcilable. Smith testified that about 2:30 or 3:00 o'clock a.m. on Monday morning, October 6, 1986, he received a call from Latrell relating that he was in Hamilton, Alabama, and the rig loaded with hams had become inoperable. Latrell also stated that immediately prior to his departure from the C & C parking lot, Lambert had informed him no insurance of any kind existed on the tractor and trailer. Smith and his wife left their home in the town of Louin and drove to Hamilton, Alabama. Smith testified as follows:
Q How many hours did it take you to go up there?
A It took me about an hour and a half or two hours to get up there.
Q Okay. How long did it take to get the truck so that it would run?
A Oh, probably about forty-five minutes.
Q And then what did you do?
A And then we limped back into the house there with the truck missing and running rough and  and I got the  finally got the truck home and when we turned the switch off or tried to turn the truck off, we discovered the truck had been put on manual pump, which means we couldn't shut it off; but when we did get the engine killed, it could not be started again.
* * * * * *
Q Well, what does the manual pump have to do with all that?
A Well, the manual pump is supposed to operate in the event that the electrical system does not work. It will keep the engine running.
Q Did you make an effort to get your engine back to where it would run?
A Yes, sir, I did.
Q What time did you arrive back home with the vehicle?
A At 8:00 o'clock in the morning on the morning of the 6th of October.
After eating breakfast, Smith called Lambert and told him the truck was "broke down," inoperable, and Lambert needed to come and get his load. Smith further testified:
A He wanted me to deliver the load. He told me that I needed to deliver the load; in fact, that I had to deliver the load, and I told him I couldn't.
Q What kind of language was the man using to you, sir?

*1097 A He was using profane language. I told him that I was a Christian man, that I did not want to hear that kind of language and that if it didn't stop, I'd hang up on him.
Q Did he stop?
A Yes, sir, but he did tell me before that that he didn't operate around God, so he wasn't required to honor that.
Smith said that Lambert had about 25 telephone conversations with him that day. In all, Lambert insisted that Smith deliver the load. On October 7, C & C dispatched a truck and driver to Smith's home in Louin where the contents of Smith's trailer were off loaded into the C & C trailer. At that time, Smith states that he was not aware of the institution by Thomas H. Comer, Jr., attorney for C & C, of criminal proceedings for embezzlement in the Justice Court in Prentiss County. These proceedings were begun against Smith by affidavit executed by attorney Comer on October 6, 1986. The affidavit charged that Smith "did embezzle or fraudulently secrete, conceal and convert to his own use the goods, rights in action, effects, valuable security of C & C Trucking Company." The affidavit was made as a result of representations made to Attorney Comer by Lambert. A felony warrant was issued for the arrest of Smith. On Wednesday afternoon, October 8, 1986, Smith was arrested and incarcerated in the Jasper County Jail where he remained for approximately three to three and one-half hours prior to making bond in the sum of $10,000 returnable before the Justice Court judge in Prentiss County where the charges were filed.
Jasper County Sheriff Tom Green testified that during the interim between the morning of October 6 and the evening of October 7, he talked to Lambert. His recounting of that conversation follows:
Q All right, sir, relate to the Jury what the tenor of that conversation was?
A He said he was going to have criminal papers made out on the man if he didn't move the load.
* * * * * *
Q Okay. Did he say anything further about his wishes about serving the papers?
A Well, I told him if he issued the papers, of course, we would serve them, that was our job.
Q Okay, sir. Now, what I'm asking you to relate to the Jury is what the gentleman you talked with had to say about serving the warrant?
A Well, he said he wasn't really interested in the warrant being served, he was interested in his load getting moved.
Q All right, sir. Now 
A That he  what I got from it, that he was going to make out papers to get the load moved. Well, that was what he said.
Q You've been Sheriff for how long, sir?
A Twenty-one years, two months and two days.
Smith's witnesses vowed that he is a religious person and before his arrest, he frequently sang in the church and led in prayer and had a lovely relationship with his wife of 34 years; that the arrest completely devastated Smith causing his whole life to change. His relationship with former friends and acquaintances deteriorated. These witnesses testified that Smith had become withdrawn, that he and his wife had serious domestic problems and he had lost a lot of sleep and weight. Smith testified that subsequent to his arrest and incarceration, he could not get employment and failing to meet his monetary obligations, he was forced into bankruptcy. Smith stated:
I have always tried to live a clean, Christian, devoted life. I never had been trouble in my life and didn't even know what the inside of a jail looked like. I could not believe that anyone would go to such length, especially when I had not done anything.
The deputy sheriff who arrested Smith stated:
A He was  he was very nervous and very upset over the whole thing. He *1098 just kept repeating  telling me about what had happened as far as the ordeal and was very upset over it, kindly embarrassed about being arrested, you know.
Q Did he relate to you that he had asked them to come get that stuff on truck?
A Yes, sir.
On October 18, 1986, a Prentiss County Justice Court judge bound Smith over to await the action of the Prentiss County Grand Jury on the felonious charge of embezzlement. No action was taken by the subsequent Prentiss County Grand Jury and none had been taken through the date of the trial of the cause on February 28, 1989.
Attorney Comer admitted that he did not attend Smith's preliminary hearing and did not make an effort to go before the Grand Jury. Comer testified as follows:
Q Well, let's talk about the next Grand Jury. The first Grand Jury was in February, wasn't it?
A Yes, sir.
Q That would have been '87  February of '87?
A Yes, sir, I think you're correct. I don't know.
Q The next Grand Jury would've been when?
A Probably October of '87.
Q Did you make an effort to go before the Grand Jury in October of '87?
A No, sir.
Q Did any person  did Mr. Bill Lambert go before the Grand Jury?
A No, sir. Like I said, they left it up to me.
Q Did any other person of C & C go before the Grand Jury in October of '87?
A No, sir.
Q And the same would be true, then, in February of '88, wouldn't it?
A Yes, sir.

THE LAW

I.

WAS THE EVIDENCE OF MALICE AND WANT OF PROBABLE CAUSE LEGALLY INSUFFICIENT TO SUSTAIN A VERDICT AGAINST THE DEFENDANTS?
Consideration of the issue implicates our limited scope of review of jury verdicts. Where, as here, the trial judge has refused to grant a motion for JNOV, we examine all of the evidence  not just evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. All credible evidence tending to support the non-movant's case and all favorable inferences reasonably drawn therefrom are accepted as true and redound to the benefit of the non-mover. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, the motion should be granted. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the jury verdict should be allowed to stand and the motion denied, and, if it has been so denied, we have no authority to reverse. Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 442 (Miss. 1986); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). The principles are as applicable in malicious prosecution cases as any other. Royal Oil Co., Inc., 500 So.2d at 443; Owens v. Kroger Co., 430 So.2d 843, 848 (Miss. 1983); Torabi v. J.C. Penney, Inc., 438 So.2d 1354, 1355-56 (Miss. 1983); Gaylord's of Meridian, Inc. v. Sicard, 384 So.2d 1042, 1044 (Miss. 1980).
It is only when a directed verdict at the close of the plaintiff's case and again at the close of the defendant's case, would have been proper that a judgment notwithstanding the verdict is proper. Such is not the standard where the trial court is required *1099 to use its discretion in granting a motion for a new trial. The variance in proof needed to support these motions is easily explained when one recognizes that a JNOV terminates the case, whereas a new trial simply gives both parties the opportunity to relitigate the controversy. Stubblefield, 464 So.2d at 55.
Motions for JNOV are made pursuant to Rule 50(b) of the Mississippi Rules of Civil Procedure. Motions for a new trial are made pursuant to Rule 59. The concurring opinion in Jesco, Inc. v. Whitehead, 451 So.2d 706, 714-17 (Miss. 1984), points out the differences between the motions:
A greater quantum of evidence favoring the party against whom the motion is made is necessary for that party to withstand a motion for a new trial as distinguished from a motion for j.n.o.v. Under our established case law, the trial judge should set aside a jury's verdict when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial weight of the evidence. Mobile and Ohio Railroad Co. v. Bennett, 127 Miss. 413, 415, 90 So. 113 (1921); Columbus and Greenville Railway Co. v. Buford, 150 Miss. 832, 840, 116 So. 817 (1928); Odier v. Sumrall, 353 So.2d 1370, 1374 (Miss. 1978);
* * * * * *
A new trial does not deprive a litigant of his right to trial by jury. It merely requires that he submit to trial before a second jury.
Without going into an extended historical analysis, we regard it as accepted law that our trial courts have the authority to set aside a jury verdict, where, in the exercise of their sound discretion, they regard such a verdict as being contrary to the substantial weight of the evidence. See Rule 59(a)(1), M.R.C.P.
* * * * * *
The motion for a new trial has long been an element of our procedural system. We regard it as a necessary component of procedural justice in civil actions. It is employed in those rare cases when there would be injustice either in allowing the verdict to stand or in granting a j.n.o.v.
* * * * * *
[W]hile the rules regarding the trial judge's discretion and authority are well-established, the point on appeal is a bit trickier. We sit as an appellate court, not as a trial court. We do not consider these matters de novo. Rather, our review is limited to an inquiry whether the ruling of the trial judge may be fairly characterized as an abuse of discretion. See Dorris v. Carr, 330 So.2d 872, 873-74 (Miss. 1976); Taylor v. Washington Terminal Co., 409 F.2d 145, 147-48 (D.C. Cir.1969); Dupont v. Southern Pacific Co., 366 F.2d 193, 198 (5th Cir. 1966); Morinville v. Morinville, 116 R.I. 507, 359 A.2d 48, 52-54 (1976).
Our review of a trial judge's exercise of discretion necessarily involves a substantial amount of discretion  and deference  on our part. In matters such as these we must always recognize that it is the trial judge who is on the scene. There is no way we could ever become as familiar with the proceedings at trial as the trial judge. Cf. Culbreath v. Johnson, 427 So.2d 705, 708 (Miss. 1983). We should give substantial weight, deference and respect to the decision of the trial judge in matters such as this.
We proceed with application of our scope of review to the appellate issues.

A. Malice
We have, on several occasions, articulated the elements of malicious criminal prosecution as:
(1) The institution or continuation of original judicial proceedings, either criminal or civil;
(2) By, or at the insistence of the defendants;
(3) The termination of such proceeding in plaintiff's favor;
(4) Malice in instituting the proceedings;
(5) Want of probable cause for the proceedings; and
*1100 (6) The suffering of damages as a result of the action or prosecution complained of.
Strong v. Nicholson, 580 So.2d 1288, 1293 (Miss. 1991); Miss. Road Supply v. Zurich-American Ins. Co., 501 So.2d 412 (Miss. 1987); Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 442 (Miss. 1986); Pugh v. Easterling, 367 So.2d 935, 937 (Miss. 1979).
C & C and Lambert focus their attention on elements (4) and (5) conceding establishment of the remaining elements. In determining whether malice existed in the institution of the criminal proceedings, we note that the term "malice" in the law of malicious prosecution is used in an artificial and legal sense and is applied to prosecutions instituted primarily for a purpose other than that of bringing an offender to justice. Benjamin v. Hooper Electronic Supply Co., 568 So.2d 1182, 1191 (Miss. 1990). It may be proved by circumstantial evidence or the jury may infer malice from the facts of the case. Moreover, absence of probable cause for the prosecution is circumstantial evidence of malice. Further, malice may be inferred from a finding that the defendant acted in reckless disregard of another person's rights. In Strong v. Nicholson, 580 So.2d 1288 (Miss. 1991), malice existed where the defendants freely conceded that their lone purpose in instituting criminal proceedings was to "get their stuff back" and that they really didn't care what happened to plaintiffs. We have emphasized that since the question of malice is a question of fact, it is to be determined by the jury unless only one conclusion may reasonably be drawn from the evidence. Benjamin, 568 So.2d at 1191; Owens v. Kroger Co., 430 So.2d 843, 848 (Miss. 1983), [quoting Brown v. Watkins, 213 Miss. 365, 373, 56 So.2d 888, 891 (1952)]. In this case, the testimony of Sheriff Green established that C & C and Lambert weren't "really interested in the warrant being served, they were interested in the load getting moved." The testimony was sufficient to undergird the jury's finding as a matter of fact that malice existed. This portion of the assigned error is without merit.

B. Probable Cause
Probable cause requires the concurrence of an honest belief in the guilt of the person accused and reasonable grounds for such belief. Strong, 580 So.2d at 1294; Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 443 (Miss. 1986); Harvill v. Tabor, 240 Miss. 750, 755, 128 So.2d 863, 865 (1961). While a malicious prosecution plaintiff has the burden of production and persuasion of showing lack of probable cause, proof of lack of probable cause on any one element of the crime charged and which forms the basis of the action is sufficient to establish this element of the tort. Strong, 580 So.2d at 1294-95.
Lambert testified that he thought Smith was going to sell and dispose of the load as follows:
My experience in the trucking business and with this load is that this stuff is packaged, processed and in the package and can go straight from that truck to any supermarket or store in the country. It's packaged and ready to go. He could've easily sold any amount of that load that he wanted to. And that's what I thought he was going to do. That's what he indicated that he was going to do. And it was at that point that I just simply gave up and I said, "I believe the man is going to do what he is threatening to do." And that's what it was, a threat. And I had no other cause to believe that he wasn't going to do it because I had went through every possibility and offered to do everything that we could to keep him from doing that. But our conversation, when it moved from the point past insurance, past the truck broke down and couldn't be fixed, past the business about insurance, then for the critical point, you know, I didn't want to send a truck down there. It cost us, it cost us double to do that, but at that point I believed that he was going to keep the load. In fact, that's what he said he was going to do. I believed he was going to sell it because that's what he indicated he was going to do. At that point I called the Sheriff and asked the *1101 Sheriff if he knew Mr. Smith and told him what he was doing... .
* * * * * *
[I] talked to the Sheriff and the Sheriff said  I asked the Sheriff  that I believed  I can't remember exactly our conversation but I believed he was going to do something with the load and asked him if he would help us with it. He said he would but he couldn't do anything unless we wanted to charge the man with something. At that point, I talked to Mr. Comer and we believed  he asked my opinion. I said, "I believe the man is going to sell it or sell part of it if not all of it." ...
On cross-examination, Lambert admitted Smith never said that he was converting the load to his own use.
Smith testified that from day one he requested Lambert to send someone to get the load.
It is apparent that neither Lambert nor Attorney Comer were in possession of facts from which it could be reasonably inferred that Smith had converted the load, a fact essential to the charge of embezzlement. Lack of probable cause on this one element of embezzlement is sufficient to establish this requisite of the tort. Strong, 580 So.2d at 1295. Moreover, the question is not whether Lambert thought probable cause existed, but whether the fact finders thought he did. Strong, 580 So.2d at 1294.
The evidence is sufficient to sustain the finding by the jury of lack of probable cause for the criminal proceedings instituted against Smith. This portion of the assigned error is also without merit.

II.

WAS IT CONTRARY TO LAW FOR THE TRIAL COURT TO SUBMIT THE ISSUE OF PUNITIVE DAMAGES TO THE JURY WHEN THE PROOF SHOWED C & C's WORTH TO BE ZERO?
C & C contends on appeal that the trial court erred in submitting the issue of punitive damages to the jury when the uncontradicted proof showed C & C's net worth to be zero. Smith asserts on cross-appeal that the trial court erred in granting Lambert a JNOV nullifying the award of punitive damages because the jury was not informed of his net worth.
While the record is not clear pertaining to C & C's net worth it does disclose that after Lambert testified, the parties stipulated into the record that "if Bill Lambert were to take the witness stand his testimony would be that his personal net worth is zero." The record shows that Lambert terminated his employment with C & C in 1986 and at the time of trial was employed by Attorney Comer as a paralegal with earnings of $120.00 per week. C & C discontinued their hauling operation in 1986 subsequent to the filing of the tort action. The corporation was dissolved in 1987. Phillip Cole, major stockholder of C & C, obtained the corporate ICC authority as well as the three trailers of the entity and began operating a trucking company in his own name.
C & C and Lambert argue that Smith's failure to prove some net worth on their part precludes an award of punitive damages. They rely on Whittington v. Whittington, 535 So.2d 573 (Miss. 1988); T.C.L., Inc. v. Lacoste, 431 So.2d 918 (Miss. 1983); Gaylord's of Meridian, Inc. v. Sicard, 384 So.2d 1042 (Miss. 1980); First National Bank of Iuka v. Mitchell, 359 So.2d 1376 (Miss. 1978); and Snowden v. Osborne, 269 So.2d 858 (Miss. 1972). An examination of these cases indicates at first blush that we have applied this standard at least since Snowden. We again consider the rationale undergirding approval of awards of punitive damages.
In Redden, Punitive Damages, § 5.2(A)(24), p. 356 (1980), we are told that in Mississippi:
Punitive damages are assessed by way of punishment against a defendant for unlawful, malicious, wanton and reckless acts, and they are allowed by reason of undertaking to prevent its recurring in the future. .. . Exemplary or punitive damages are those, of course, which are in addition to the actual or compensatory *1102 settlement. They are granted in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred from the commission of similar offense thereby in theory protecting the public... . Punitive damages may also be awarded if the damage was done by gross negligence that is equivalent to wilful and wanton mischief. Neal v. Newburger Co., 154 Miss. 691, 123 So. 861 (1929)... .
These precepts have been followed in Wirtz v. Switzer, 586 So.2d 775, 783 (Miss. 1991), T.C.L. v. Lacoste, 431 So.2d at 923 and Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977).
Punitive damages are properly allowed where the tort complained of was malicious, wanton, wilful, or capricious. Royal Oil Co., Inc., 500 So.2d at 450; Yazoo & M.V.R. Co. v. Williams, 87 Miss. 344, 355, 39 So. 489, 491 (1905); see also Newsom v. Henry, 443 So.2d 817, 824 (Miss. 1983); T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss. 1972); Friendly Finance Co. of Biloxi, Inc. v. Mallett, 243 So.2d 403, 406 (Miss. 1971). Further, a finding of malice will give rise to an assessment of punitive damages. Aetna Casualty & Surety Co. v. Day, 487 So.2d 830 (Miss. 1986); Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss. 1986).
In determining the propriety of submitting the issue of punitive damages to the jury, the trial court decides whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard. Colonial Mortgage Co., Inc. v. Lee, 525 So.2d 804, 808 (Miss. 1988).
According to 22 Am.Jur.2d 986 § 953 (1988), the following rules apply where punitive damages are recoverable:
As a general rule, evidence of the wealth or financial condition of the defendant is admissible upon the issue of the amount of punitive damages that may be awarded against him, generally on the theory that the allowance of a given sum would be a greater punishment to a man of small means than to one possessing larger wealth, although there are a few contrary holdings. Thus, it has been recognized that a defendant may introduce evidence of his impecunity on the question of exemplary or punitive damages....

As a predicate on a claim for punitive damages, plaintiff is not required to introduce evidence of defendant's financial worth and ability to pay an award for punitive damages. But where evidence of financial worth is admissible for consideration by the jury on the plaintiff's behalf to increase the damages, evidence as to defendant's lack of financial resources is similarly admissible on defendant's behalf to diminish the damages... .
There is authority to the effect that evidence of financial worth is not admissible until the trier of fact determines the defendant's liability for punitive damages, or at least until there has been prima facie proof of plaintiff's right to recover punitive damages. [Emphasis Added].
The rules articulated in Am.Jur.2d do not require proof of net worth prerequisite to an award of punitive damages. Snowden v. Osborne is the first case of recent vintage suggesting the effect of failure to prove a defendant's worth when the amount of an award for punitive damages is challenged. In Snowden, we stated:
[W]e are nevertheless constrained to the opinion that there was insufficient evidence adduced to affirm a punitive award in the sum of $30,000. The record is silent as to the worth of the defendant although it does reveal that he had prior to this suit disposed of his real property without mentioning the consideration received.
Snowden, 269 So.2d at 861.
In First American Nat. Bank of Iuka, we used Snowden as a reference point, reversed because punitive damages were grossly excessive and stated:
Absent some proper showing of the net worth or financial condition of FANB, we *1103 have no way to measure the correctness of the punitive damage award.
First American, 359 So.2d at 1381.
In Gaylord's of Meridian, we again reversed an award of punitive damages and embellished on our prior pronouncements by enunciating:
There was no evidence relating to the financial worth of Gaylord's and there was no guide whereby the jury could determine punitive damages. In First American National Bank of Iuka v. Mitchell, 359 So.2d 1376 (Miss. 1978), the Court held that without a showing of the net worth or financial condition of the defendant, there was no way to measure the punitive damage award.
Gaylord's, 384 So.2d at 1045.
Finally in Whittington v. Whittington, we reversed an appeal awarding $40,000 punitive damages on a defendant's cross-claim and stated:
The defendant's proof failed to adequately establish her net worth-assets minus liabilities-so as to serve as a measure for the Court to consider in arriving at a sum to award as punishment in this case.
Whittington, 535 So.2d at 584.
T.C.L., Inc., Employers Mutual Casualty Co. v. Tompkins, 490 So.2d 897 (Miss. 1986), Bankers Life & Casualty Co., First American National Bank of Iuka, and Snowden were cited as authorities for the pronouncement.
For whatever reason, we have failed to follow traditional rules from Snowden to Whittington. Literal adherence to a requirement of proof of net worth prerequisite to an award of punitive damages results in a defendant with zero net worth being ipso facto excluded and absolved from payment of such damages. We fail to see the reason underlying such a rule. Moreover, in Collins v. Black, 380 So.2d 241 (Miss. 1980), we stated, "The pecuniary ability to respond to a verdict for punitive damages may be considered by a jury, but it is not the sole factor to be considered by them."[3]
In Aaron v. Rinaldi, 296 So.2d 632 (Fla. App. 1974), the following issue was certified to the District Court of Appeals, Third District:

QUESTION

WHETHER OR NOT THE PLAINTIFF MUST AS A PREDICATE FOR HIS CLAIM FOR PUNITIVE DAMAGES INTRODUCE EVIDENCE OF THE DEFENDANT'S FINANCIAL WORTH AND ABILITY TO PAY ANY AWARD OF PUNITIVE DAMAGES IN ORDER FOR THE ISSUE TO BE CONSIDERED BY THE JURY?
The Florida Court of Appeals held that evidence of the defendant's financial worth is not a predicate for award of punitive damages and opined:
In determining the amount of punitive damages, a jury properly may consider the nature, extent, and enormity of the wrong, the intent of the party committing it, and generally all the circumstances attending the particular transaction involved, as well as any mitigating circumstances which may operate to reduce without wholly defeating such damages, including the financial and social condition and standing of the party. 22 Am.Jur.2d, Damages § 264 (1965); 9A Fla.Jur. Damages § 118 (1972). However, evidence of the defendant's financial position may not be considered in passing upon the question of law as to whether the case is one in which punitive damages may be allowed. 22 Am.Jur.2d, Damages § 322 (1965).
In light of the foregoing principles, it is apparent that the financial worth of the defendant is one of many elements, which properly may be considered by a jury in its determination of the amount to be awarded as punitive damages, but evidence of worth is not a requisite to such award. See Charles v. Texas Co., 199 S.C. 156, 18 S.E.2d 719 (1942); Rogers *1104 v. Florence Printing Company, 233 S.C. 567, 106 S.E.2d 258 (1958).
Further, although the defendant's financial worth is admissible for consideration by the jury of the amount of punitive damages to be awarded, the burden of proof of worth is not exclusively upon the complainant as in absence of introduction of such proof by the complainant, defendant may introduce his financial ability to pay an award of punitive damages for the purpose of mitigation thereof. See, e.g. Holmes v. Hollingsworth, 234 Ark. 347, 352 S.W.2d 96 at 99 (1961).
296 So.2d at 633-34.
The cause was reviewed by the Florida Supreme Court on writ of certiorari in Rinaldi v. Aaron, 314 So.2d 762 (Fla. 1975). On review, the Florida Supreme Court affirmed the decision of the Court of Appeals and articulated:
[W]e agree with the District Court of Appeal, Third District, sub judice in answering the certified question posited by the trial court in the negative and we hold that evidence of financial worth is admissible and may be considered by the jury in its determination of the amount to be awarded as punitive damages, but evidence of worth is not a requisite to such award. If defendant's financial worth is meager, it would be to his advantage to introduce such evidence in order to mitigate the damage award. As was stated by Sutherland in his Treatise on Damages, § 404 at 1315, "In cases where it is competent for the plaintiff to prove the wealth of the defendant to increase the damages, it is equally competent for the defendant to show a want of it to diminish them."
314 So.2d at 765.
In Evans v. Thompson, 762 P.2d 754 (Colo.Ct. of App., Div. II, 1988), the Colorado Appeal Court considered the necessity of evidence regarding the defendant's economic status as an essential element of proof for exemplary damages. In reversing the action of the trial court granting a JNOV, and holding that such proof was not a prerequisite to an award the court opined:
The trial court erroneously interpreted Leidholt v. District Court, 619 P.2d 768 (Colo. 1980) and Palmer v. A.H. Robins Co., 684 P.2d 187 (Colo. 1984), to require evidence of the financial condition of the defendant as a prerequisite to an award of exemplary damages. Neither of these cases hold that such evidence is mandatory, but rather, that evidence of the defendant's financial condition is a proper factor to be considered by the jury in fixing the amount of exemplary damages. The extent of the defendant's assets may be considered to insure that the award will punish the defendant, for what may be punishment to one defendant may not be sufficient punishment for another. Leidholt, supra; Mailloux v. Bradley, 643 P.2d 797 (Colo. App. 1982).
* * * * * *
If a defendant has a few assets, he might introduce such evidence to demonstrate that a minimal award of exemplary damages would serve the punishment and deterrence functions. Similarly, a plaintiff could introduce evidence of the defendant's wealth to demonstrate the need for a large award of exemplary damages. However, failure of either party to take advantage of the opportunity to present such evidence would not vitiate the claim for exemplary damages. See Rinaldi v. Aaron, 314 So.2d 762 (Fla. 1975), discussed in Annot. 79 A.L.R.3d 1132 (1972). Finally, we note that in Palmer, supra, upon which the trial court relied, the financial status of the defendant was not considered by the jury in awarding punitive damages. Our supreme court indicated that it found no reversible error on these grounds. Palmer v. A.H. Robins, Co., supra, at 220.
762 P.2d at 755.
In Papcun v. Piggy Bag Discount Souvenirs, Food & Gas Corporation, 472 So.2d 880 (Fla.App. 5th Dist. 1985), the Florida Appeals Court addressed the issue of the necessity of defendant's net worth as a prerequisite to a punitive damage award. In holding that net worth proof, while admissible, is not a requisite to an award, the court stated:

*1105 The remaining question is whether the trial court erred in granting a new trial on the punitive damages issue because there was insufficient evidence of the net worth of appellees. Proof of net worth of a defendant, while admissible, is not a prerequisite to an award of punitive damages. Bould v. Touchette, 349 So.2d 1181 (Fla. 1977); Rinaldi v. Aaron, 314 So.2d 762 (Fla. 1975). In Rinaldi, the court succinctly set down the principle:
[E]vidence of financial worth is admissible and may be considered by the jury in its determination of the amount to be awarded as punitive damages, but evidence of worth is not a requisite to such award. If defendant's financial worth is meager, it would be to his advantage to introduce such evidence in order to mitigate the damage award.
314 So.2d at 765.
To preserve his right to contend on appeal that an award of punitive damages is excessive, it is incumbent on the defendant to introduce evidence of his net worth, if evidence has not been introduced by plaintiff, and in the absence of such evidence an appellate court cannot say that an award of punitive damages is excessive in that it would bankrupt the defendant. Bould v. Touchette, 349 So.2d at 1187; Louisville & Nashville R. Co. v. Hickman, 445 So.2d 1023, 1028 (Fla. 1st DCA 1983).
472 So.2d at 882.
The Rinaldi and Papcun decisions were followed in Rety v. Green, 546 So.2d 410 (Fla.App. 3 Dist. 1989). In Rety, the appeal court also intoned:
[T]he defendants had the burden of establishing what their net worth was in order to later make an "economic castigation" claim as to the punitive damages awarded; the plaintiff had no burden to establish that the defendants had the financial ability to pay a punitive damage award.
In Woods-Drake v. Lundy, 667 F.2d 1198, 1203 (N. 9) (5th Cir.1980), the federal court placed the burden on the defendant to produce financial evidence which might be considered in mitigation of punitive damages.
We hold that it is not legally necessary for either plaintiff or defendant to introduce evidence of the net worth of the defendant during the trial to support an award of punitive damages. If, however, no such evidence is presented, neither party may challenge on appeal either the inadequacy or the excessiveness of a punitive damages award. If a party wishes to preserve the question for appeal, evidence of net worth must be presented at trial, or error in the amount of punitive damages is waived.
In Whittington, we set out the various considerations approved by the Court in assessing punitive damages:
(1) Such an amount as is necessary for the punishment of the wrongdoing of the defendant and deterring the defendant from similar conduct in the future, Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977);
(2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 808 (Miss. 1983); T.C.L., Inc. v. Lacoste, 431 So.2d 918, 923 (Miss. 1983); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983); Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972); and
(3) The pecuniary ability or the financial worth of the defendant. Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1978); Jones v. Carter, 192 Miss. 603, 610, 7 So.2d 519 (1942).
Whittington, 535 So.2d at 583-84.
We reaffirm these accepted considerations in making punitive assessment but reject the expressions in the cases of Snowden, First Nat. Bank of Iuka, T.C.L., Inc., Gaylord's of Meridian, Inc. and Whittington that proof of net worth is prerequisite to an award of punitive damages. To the *1106 extent that any of the cases hold otherwise, they are overruled.
Neither the stipulation of the parties to the effect that Lambert had a zero net worth nor failure of the record to clearly show C & C's net worth changes the result, because a jury may properly assess punitive damages to a party having no net worth. To hold otherwise would license those meeting this criterion to contravene legal standards without corresponding liability. Moreover, the financial worth of a defendant is only one of the various considerations in assessing punitive damages.
The trial court did not err in submitting the issue of punitive damages to the jury. On the other hand Smith's assertion via cross appeal of trial court error in granting Lambert a J.N.O.V. on the ground that the jury was not informed of his net worth bears merit.

III.

WAS THE VERDICT OF $25,000 ACTUAL DAMAGES AND $50,000 PUNITIVE DAMAGES AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND SO GROSSLY EXCESSIVE AS TO BE SHOCKING, EVINCING BIAS, PASSION AND PREJUDICE?
C & C and Lambert's argument pertaining to the damages awarded by the jury is subject to our oft stated scope of review:
Our general rule is that a damage award may be altered or amended only when it is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience. Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 278 (Miss. 1985); Jesco, Inc. v. Shannon, 451 So.2d 694, 705 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 481 (Miss. 1983). We are not authorized to disturb a jury verdict regarding amount of damages because it "seems too high" or "seems too low". Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 278 (Miss. 1985); Toyota Motor Co., Ltd. v. Sanford, 375 So.2d 1036, 1037 (Miss. 1979).
Motions challenging the quantum of damages and seeking a remittitur are by their very nature committed to the sound discretion of the trial judge. Where the trial judge acts upon these matters, we reverse only if he has abused or exceeded his discretion. Dorris v. Carr, 330 So.2d 872, 874 (Miss. 1976).
Royal Oil Co., Inc., 500 So.2d at 449.
Prior to his arrest for embezzlement, a crime involving moral turpitude, Smith possessed an excellent reputation for honesty and community service. He was known for his church work and was often requested to pray and sing solos, taking an active part in congregation activities. Smith was known for his outgoing personality. He was talkative and bursting with energy, being a healthy individual with a happy marriage of more than thirty-four years. His arrest and incarceration for the crime of embezzlement started rumors in the small community where he resided. As a result, he ceased to participate in church affairs. He became withdrawn, having little to do with former friends and neighbors. He lost weight. Marital problems escalated between Smith and his wife. He became depressed and no longer found any joy in living. His attitude and feelings were shown in the following statement:
Q Tell the jury how it affected you.
A Because I feel like some of the people, not all of them, of course, but some of the people actually believed the allegations that I was guilty of something... . It affected my character, and I felt real ashamed that my friends would think  be forced to think that of me, even though it wasn't true.
It would be difficult to visualize or describe the mental anguish and emotional distress suffered by Smith. Smith was entitled to recover damages for harm to his reputation resulting from the criminal proceedings brought against him. He was also entitled to recover for mental anguish and distress causally resulting from the proceedings. Royal Oil Co., Inc., 500 So.2d at 448; Gandy v. Palmer, 251 Miss. 398, 169 So.2d 819 (1964); State Life Ins. *1107 Co. of Indianapolis v. Hardy, 189 Miss. 266, 195 So. 708 (1940). The very nature of damages often sustained in malicious prosecution actions makes such damages difficult to quantify in monetary terms.
We have carefully reviewed the evidence of damages suffered by Smith and, keeping in mind the nature of damages in malicious prosecution actions as well as the difficulty in quantifying such damages in monetary terms, we find the jury verdict of $25,000 for actual damages is supported by the evidence.
In considering the assertion of an excessive punitive damage award, we remain mindful of our former expressions that we are not authorized to disturb a jury verdict regarding punitive damages because it "seems too high" or "seems too low." Only where the verdict is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the judicial conscience may we interfere. Life Insurance Co. of Mississippi v. Allen, 518 So.2d 1189, 1194 (Miss. 1987); Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 277-79 (Miss. 1985). We also observe that the factors related in Whittington, Mutual Life Ins. v. Estate of Wesson, 517 So.2d 521, 532 (Miss. 1987), and Bankers Life and Casualty Co. for consideration by a jury in determining the quantum of punitive damages are inclusive and not exclusive. In 22 Am.Jur.2d Damages § 807, p. 854, (1988) the following rule is stated: "In assessing exemplary damages, the trier of fact should consider the nature, extent, and enormity of the wrong, the intent of the party committing it, and, generally, all the circumstances attending the particular occurrence." Other factors have been approved. In Ford Motor Co. v. Durrill, 714 S.W.2d 329 (Texas Civ.App. 1986), the Texas Appeals Court considered the following factors in arriving at the award: (1) nature of the wrong; (2) character of the conduct involved; (3) degree of culpability of wrongdoer; (4) situation and sensibilities of parties concerned; (5) extent to which such conduct offends a public sense of justice and propriety; and (6) the proportion that the punitive award bears to the compensatory damages. The exigency of each case determines the parameters of appropriate factors for jury consideration. No formulation of precise rules of law have been made to determine whether an award of punitive damages is excessive. No fixed legal ratio between actual and punitive damage exists. No bright line of demarcation tells us when exemplary damages are excessive. It would be difficult, if not impossible, to state a rule with absolute precision.
Redden, Punitive Damages, § 2.1(C), p. 23 (2d ed. 1989) tells us:
Punitive damages are accepted or rejected on policy grounds... . In most jurisdictions, the court will award punitive damages because of the positive public policy to punish the defendant and to serve as a warning or example to others who may commit similar outrageous acts in the future. These public policy grounds are also found to be in the interest of society and for the public benefit.
After careful consideration of the record, we cannot say that the verdict is so excessive that it evinces such passion, bias, and prejudice on the part of the jury that our judicial conscience is shocked.
We find the errors assigned by C & C and Lambert on appeal to be without merit and affirm on direct appeal. However, we find merit in Smith's cross-appeal. Because the trial court erred in granting Lambert a JNOV, this action by the trial court is reversed and the jury verdict is reinstated.
AFFIRMED ON DIRECT APPEAL; REVERSED AND RENDERED ON CROSS-APPEAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ. and PRATHER, PITTMAN, BANKS and McRAE, JJ., concur.
ROBERTS, J., not participating.
NOTES
[1] Smith recovered $1,753.59 in the same action for breach of contract. The issues involved in this appeal do not relate to or concern this portion of the trial court judgment.
[2] The grounds for the motion were (a) failure of Smith to prove elements of malicious prosecution; (b) Smith failed to prove the net worth of defendants; and (c) the jury verdict was contrary to and against the overwhelming weight of the evidence and evinced bias, passion and prejudice on the part of the jury.
[3] For a list of the states and cases holding the defendant's financial circumstances is a relevant factor for consideration in assessing the amount of punitive damages, but such evidence is not prerequisite to an award, see 87 A.L.R. 4th 166, Punitive Damages: Wealth Factor, § 4 (1991).