McMILLIN, C.J.,
dissenting:
¶ 36. I respectfully dissent. In my view, Baker failed to prove one of the essential elements of a claim for malicious prosecution, and for that failure, I would reverse and render the judgment. Baker failed to show by a preponderance of the evidence that the Gaming Commission agents lacked probable cause to prefer criminal charges against him. That is fatal to his case, no matter how disturbing the heavy- *1138 handed behavior of the agents might appear.
¶ 37. Professor Prosser, in his classic work on torts, emphasizes the importance of the element of lack of probable cause by observing that the tort of malicious prosecution is one that “runs counter to obvious policies of the law in favor of encouraging proceedings against those who are apparently guilty.... ” W. Page Keeton Et Al., Prosser and Keeton on the Law of Torts § 119 (5th ed.1984). He goes on to indicate that, for this reason, the action “has never been regarded with any favor by the courts, and it is hedged with restrictions which make it very difficult to maintain.” Id. He then comments that the chief restriction imposed by the law is that the plaintiff must demonstrate that the action was commenced without probable cause and that the presence of probable cause to bring a criminal prosecution is a defense even though the element of malice has undoubtedly been shown. According to Prosser, these are two entirely unrelated considerations, and “[t]he existence of such “malice” does not create even an inference that probable cause was lacking.” Id.
¶ 38. In Mississippi, “probable cause” has been said to be the “concurrence of an honest belief in the guilt of the person accused and reasonable grounds for such belief.” Moon v. Condere Corp., 690 So.2d 1191, 1194 (Miss.1997) (citing C & C Trucking Co. v. Smith, 612 So.2d 1092, 1099-1100 (Miss.1992)). In the case now before us, the affidavits leading to Baker’s arrest charged him with two separate criminal offenses, both arising out of Mississippi’s laws regulating gaming found in Chapter 33 of Title 97 of the Mississippi Code.
¶ 39. One affidavit was based on the factual allegation that Baker had been signing Reynolds’s name to checks issued for various purposes connected with the Amvet 350 bingo operation. Specifically, the affidavit indicated that the agents were charging that such practice violated Section 97-33-75(2)(c). That section provided criminal liability for “[kjnowingly falsifying or making any false entry in any books or records, with respect to any transaction connected with the holding, operating or conducting of any bingo game.... ” Miss. Code Ann. § 97-33-75(2)(c) (Rev.1994).
¶ 40. Baker, in addressing the probable cause question on this affidavit, does not attempt to argue that a check is not a “record” within the meaning of the statute. Baker, instead, couches his argument in terms of his claim that he had both the verbal and written permission of Reynolds to sign his name to these checks so that his actions in doing so did not constitute a false entry on the check.
¶ 41. I would not think that the issue may be dismissed as easily as Baker would have us think. In the more traditional setting, where the person whose name was forged is the victim of the crime, evidence that the purported victim had actually extended permission to the forger would be a legitimate defense to a criminal prosecution. See Freeman v. State, 293 So.2d 469, 470 (Miss.1974). However, we are not dealing in this case with normal principles of criminal forgery. There are different considerations at play in this case which require one to view in a different light the claim that Reynolds was agreeable to having Baker sign his name to the checks.
¶ 42. Bingo operations, permitted in this State only as a fund-raising activity “for the benefit of a charitable organization,” are subject to stringent statutory regulation. Miss.Code Ann. § 97-33-52(l)(a) (Rev.1994). Among those restrictions designed to maintain the purely charitable purpose of the games is the requirement that the game “may be conducted only ... [w]hen the game is held by active members of such organization.” Miss.Code Ann. § 97-33-52(l)(b) (Rev.1994). The requirement that the game be operated by the membership of a bona fide charitable organization is further driven home by Section 97-33-69(1), which states that, subject to certain exceptions having no *1139 application to this case, “no person shall hold, operate, conduct or assist in holding, operating or conducting, any bingo game ... except designated supervisors or alternate supervisors designated as provided for in Section 97-33-67(3).” Miss.Code Ann. § 97-33-69(1) (Supp.1998).
¶ 43. It is undisputed that Baker was not a member of Amvet 350 and was, thus, not authorized to operate the bingo game. It cannot be the subject of legitimate dispute, based on the facts gathered by these gaming commission agents during their investigation, that Baker was very much involved in the Amvet 350 operation. On those facts, it is understandable that these investigators reasonably believed that one of the primary reasons, if not the only reason, that Baker persisted in signing Reynolds’s names to the checks rather than his own was to conceal the fact of Baker’s unauthorized activities at Amvet 350. Being of that opinion — an opinion that appeal’s entirely plausible to me — these agents had a reasonable basis to believe that Baker’s signing a false name to the checks was a “false entry” in bingo records made for the specific purpose of hiding his illegal participation in the Amvet 350 bingo operation.
¶ 44. The second affidavit charged that, on August 11, Baker had conspired with another person to file with the Commission a power of attorney from Reynolds to Baker executed on or after August 11 but improperly backdated to August 3 in an attempt to legitimize Baker’s activities during the period of August 3 to August 11. The affidavit suggested that this conspiracy was a criminal violation of Section 97-33-75(2)(e), which made criminal the act of “[ijntentionally ... conspiring with another to cause any person to violate any provision of Sections 97-33-51 through 97-33-203.... ” Miss.Code Ann. § 97-33-75(2)(e) (Rev.1994). There is no doubt that these officers had reasonable cause to believe that Baker and Reynolds had conspired together to submit this backdated power of attorney. Through the cooperation of another individual associated with the Amvet 350 operation, and unknown to Baker, the agents had been shown the actual proposed power of attorney form in an unsigned condition on August 11. One of the agents had made a small, largely imperceptible, mark on the document that would permit its ready identification at a future date. Under cover of a letter dated August 14, 1995 signed by Baker personally, this same document containing the distinguishing mark, but now bearing Reynolds’s signature and a purported execution date of August 3, was forwarded to the Commission.
¶ 45. The only issue, therefore, becomes whether the agents had reasonable cause to believe that submitting this fraudulently backdated power of attorney was a violation of any provision of Sections 97-33-51 through 97-33-203. Section 97-33-69(1), as we have already observed, prohibited Baker from operating or assisting in the operation of the Amvet 350 bingo game. While I have grave reservations as to whether even a properly executed power of attorney would have made Baker’s activities legal under Section 97-33-69(1), I am nevertheless satisfied that Reynolds and Baker were of that opinion. Therefore, the motivating force for filing the backdated document was to cover up Baker’s previous improper actions. Section 97-33-75(2)(a) prohibits the making of “any false statement ... in any official report to the commission....” Miss.Code Ann. § 97-33-75(2)(a) (Rev.1994). I am satisfied that Baker’s letter, intended to constitute his official response to the matters under investigation by the Commission, could be interpreted as an “official report to the commission” within the meaning of the statute. Therefore, the act of Baker and Reynolds in conspiring to procure this falsely-dated power of attorney was to facilitate Baker’s violation of the provision prohibiting the filing of a report containing a false statement.
¶ 46.1 am, therefore, of the opinion that, as to both affidavits, Baker failed to pres *1140 ent competent evidence to create a jury-question on lack of probable cause to believe that Baker had violated the State’s gaming laws. Because it appears beyond reasonable argument that, on facts not disputed by Baker, the agents did have a reasonable basis to think that Baker had violated the criminal provisions of the gaming law, there is no basis to hold that the agents lacked probable cause to execute the affidavits that led to Baker’s arrest and incarceration. That being the case, there is no basis to permit the verdict in his favor based on a claim of malicious prosecution to stand.
¶ 47. The majority suggests that these agents were somehow unequivocally obligated to accept Reynolds’s statements regarding the purposes of his arrangement with Baker, and, that, because of their duty to accept Reynolds’s assertions at face value, they could not have had probable cause to believe Baker may have been implicated in criminal activity. It is my view that, based upon all the knowledge available to the Gaming Commission agents at the time the affidavits were signed, these agents were not obligated to accept Reynolds’s representations at face value. There was every reason to suspect that Reynolds himself was actively involved in concealing Baker’s improper involvement in the Amvet 350 operation. In that situation, I can see nothing that would require the agents to give complete credence to everything Reynolds told them.
¶ 48. An investigative officer involved in law enforcement activities is expected to be neither a lawyer, nor a juror, nor a judge. The decision to prefer charges does not have to carry with it a guarantee of guilt in order to be a proper exercise of a law enforcement officer’s function. So long as the officer is conversant with the particular law under consideration and is possessed of sufficient facts to form a reasonable conclusion that criminal activity has occurred, he ought to be in a position to bring the charges. The ultimate disposition of those charges is a matter not within the investigating officer’s purview.
¶ 49. In this particular case, I have a fundamental disagreement with the majority on two fronts. The first is when it seems to say that, so long as Reynolds’s version of events was true, there was absolutely no basis to charge Baker with criminal activity. I am convinced that, based upon other evidence known to these officers, it would have been possible to charge and convict Baker of gaming law violations even if he had been acting with Reynolds’s full permission and consent. At the very least, that would appear to be a fairly debatable point of law, and yet the majority charges these agents with deciding the outcome of that debate in advance on peril of civil liability if they choose wrong. That standard is entirely too high to determine whether a public official charged with enforcing the law had a reasonable basis to conclude that the law had been violated.
¶ 50. Even more puzzling to me is the majority’s apparent view that these officers were obligated — for reasons I cannot begin to understand — to accept Reynolds’s every pronouncement and representation as the undisputed truth. Based on substantially more facts than their interview with Reynolds, these officers had every reason to suspect that Baker was improperly operating the Amvet 350 bingo operation and they could reasonably have believed that Reynolds was complicit in the scheme to conceal this fact by permitting a practice of false check-signing and by submitting a falsified power of attorney. On what basis does the majority suggest that these officers were, nonetheless, required to take Reynolds’s representations as the truth? I simply do not see it.
¶ 51. Whether a jury would have ultimately believed Reynolds and Baker and determined that this was merely a temporary and largely innocent procedure to assist Reynolds as he recovered from an illness, or whether the jury would have believed that this was an on-going scheme to permit Baker to improperly operate a *1141 bingo game in violation of the State’s gaming laws appears to me an open question. Yet the majority seems to have (a) hypothetically tried the case, (b) prejudged the credibility of a potential witness, (c) acquitted Baker, (d) charged these agents with a failure to anticipate this result in advance, and (e) assessed them with civil damages for their lack of omniscience.
¶ 52. I cannot agree with that analysis and, therefore, I dissent.
SOUTHWICK, P.J., JOINS THIS SEPARATE WRITTEN OPINION.