978 So.2d 670 (2006)
Marilyn BUSBY, Appellant
v.
Patricia ANDERSON, Executrix of the Estate of William Burnley, Deceased, Appellee.
No. 2003-CA-02699-COA.
Court of Appeals of Mississippi.
November 28, 2006.
Rehearing Denied July 31, 2007.
*672 Charles Cameron Auerswald, Richard L. Kimmel, Greenwood, attorneys for appellant.
Tara Strickland, Clifford Roy A. Smith, attorneys for appellee.
Before KING, C.J., BARNES and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. Marilyn Busby's lawsuit against William Burnley has been before the courts of this state for more than eleven years. Marilyn sued William in the Washington County Circuit Court incident to a single vehicle car accident. Marilyn was a passenger in William's car when it left the road and crashed into a ditch. Marilyn claimed William drove his car in a negligent manner and caused her to suffer injuries. William denied that he was negligent. The dispute went to trial. Ultimately, the jury returned a verdict for William. Following unsuccessful posttrial motions, Busby appeals and raises the following issues, listed verbatim:
I. THE TRIAL COURT ERRED IN DENYING MARILYN BUSBY'S REQUEST FOR PEREMPTORY INSTRUCTION.
II. THE TRIAL COURT ERRED IN DENYING MARILYN BUSBY'S POST-TRIAL MOTION TO RENEW REQUEST FOR PEREMPTORY INSTRUCTION/JUDGMENT AS A MATTER OF LAW.
III. THE TRIAL COURT ERRED IN DENYING MARILYN BUSBY'S POST-TRIAL MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
IV. THE TRIAL COURT ERRED IN DENYING MARILYN BUSBY'S POST-TRIAL MOTION TO SET ASIDE JURY VERDICT AND VACATE JUDGMENT.
V. THE TRIAL COURT ERRED IN DENYING MARILYN BUSBY'S POST-TRIAL MOTION FOR NEW TRIAL.
VI. THE TRIAL COURT ERRED IN ALLOWING DEFENDANT'S JURY INSTRUCTION D-2.
William responded and claimed that Marilyn's appeal is untimely. However, the record contained Marilyn's unresolved motion for extension of time to appeal. We notified the circuit court of Marilyn's unresolved motion for extension and gave the circuit court an opportunity to either grant or deny Marilyn's motion. The circuit court granted Marilyn's motion. As such, we turn to the merits of Marilyn's appeal. We find that the circuit court erred when it refused Marilyn's request for a peremptory *673 instruction, when it overruled Marilyn's request for a directed verdict, when it instructed the jury according to the language of instruction D-2, and when it overruled Marilyn's motion for new trial. Accordingly, we reverse and remand this matter to the circuit court for a new trial consistent with this opinion.

FACTS
¶ 2. On Monday January 18, 1993, William Burnley, Mayor of Greenville from 1975 until 1990, left Greenville, Mississippi and drove his car to Lake Providence, Louisiana. Marilyn Busby accompanied William. From 1978 until 1990, Marilyn was the Coordinator for the Greenville Beautification Department. Marilyn and William were engaged at the time.
¶ 3. William drove to Lake Providence. During their trip, Marilyn noticed that his breathing changed and that he veered over to the right. Marilyn asked William if he would let her drive. William refused to let Marilyn drive. Once they arrived in Lake Providence, William collected fifty dollars on a winning Louisiana lottery ticket and purchased more lottery tickets. Afterwards, William and Marilyn began the return trip to Greenville.
¶ 4. Marilyn testified that William's breathing changed again and that William drifted towards the center of the road. According to Marilyn, she again asked William whether he would let her drive. William refused again. Not long afterwards, William's breathing changed and he drifted off the right side of the road. Marilyn testified that she asked to drive a third time and, as he did twice before, William refused Marilyn's offer to drive. William denied that Marilyn offered to drive. Instead, William claimed that he asked Marilyn to drive for him and that she refused to drive.
¶ 5. Their return trip took them through Chicot County, Arkansas. It was in Chicot County, Arkansas that William's car veered off U.S. Highway 65. Marilyn claimed that William fell asleep. William admitted that he fell asleep. That is, William characterized his loss of control over his car to the fact that he "passed out," or was otherwise "unconscious" at the time his car left the road.
¶ 6. Emergency responders removed Marilyn and William from the car. Marilyn was taken to the Chicot Memorial Medical Center and then transferred to King's Daughters Hospital in Greenville. Marilyn stayed in King's Daughters Hospital from the date of the accident until February 22, 1993. Marilyn had serious injuries to her head, her ear was nearly severed, and she broke her right arm, multiple ribs, and her pelvis. Marilyn also sustained serious injuries to her right wrist and her lungs. Marilyn underwent surgery to repair a life-threatening lung condition known as Adult Respiratory Distress Syndrome. Additionally, Marilyn's arm required a stabilizing "Rush Rod" in order to heal properly.
¶ 7. Once she was discharged from King's Daughters, Marilyn was transferred to Methodist Rehabilitation Hospital in Jackson, Mississippi. Marilyn stayed at that hospital for an additional five weeks. Marilyn went through physical therapy and occupational therapy. After she left the Methodist Rehabilitation Hospital, Marilyn went through additional physical therapy with Delta Medical Center. Marilyn also relied on home health care to help her with her daily necessities.
¶ 8. Ten months later, Marilyn progressed to the point that Dr. Fred Sandifer performed surgery and removed the Rush Rod from her arm. Marilyn also underwent treatment for pain in her shoulder and her pelvis. Marilyn also experienced *674 severe jaw pain due to her head injuries. To treat the pain, Marilyn had to wear a splint in her mouth. Prior to trial, the parties stipulated that Marilyn's past medical expenses arising from the accident were $43,500.
¶ 9. On June 3, 1994, Marilyn filed a complaint against William in the Washington County Circuit Court. In her complaint, Marilyn alleged that William drove his car negligently and caused her to suffer "severe personal injuries and damages including past, present and future pain and suffering and emotional distress, and . . . substantial past and future medical expenses and loss of wages or wage earning capacity." Marilyn requested $500,000 in compensatory damages and $500,000 in punitive damages.
¶ 10. On March 30, 2000, the matter proceeded to trial. After each side presented evidence, the jury returned a verdict for William. The circuit court entered its final judgment on April 18, 2000. On April 27, 2000, Marilyn filed several posttrial motions. Specifically, Marilyn filed motions: (a) to renew her request for peremptory instruction and her request for a judgment as a matter of law; (b) to set aside the jury verdict and vacate the judgment; (c) for judgment notwithstanding the verdict; (d) for a new trial; and (e) to alter or amend the judgment for additur. It appears that the circuit court considered all of Marilyn's posttrial motions on August 24, 2000.[1] Following that hearing, the circuit court took Marilyn's motions under advisement. The circuit court did not file its order denying Marilyn's posttrial motions for three years. The circuit court finally filed its order on August 21, 2003.
¶ 11. On September 15, 2003, Marilyn filed a motion to extend time in which to file her notice of appeal. The circuit court neither granted nor denied that motion. In any event, after no action by the trial judge to either grant or deny her motion to extend the time for appeal, Marilyn filed her notice of appeal on October 20, 2003.[2]

ANALYSIS

I. Timeliness of Appeal
¶ 12. William claims that Marilyn's appeal is untimely. Before we address Marilyn's claims on appeal, it is proper to determine whether William is correct. If Marilyn's appeal is untimely, it is entirely unnecessary to address Marilyn's claims.
¶ 13. The circuit court overruled Marilyn's posttrial motions on August 13, 2003. According to Rule 4 of the Mississippi Rules of Appellate Procedure, once the circuit court overruled her posttrial motions, Marilyn had thirty days to file her notice of appeal. M.R.A.P. 4(a), (d). Marilyn filed her notice of appeal on October 20, 2003.
¶ 14. True enough, Marilyn filed a motion for extension of time to file her notice of appeal and the circuit court did not deny that motion. However, the circuit court did not grant that motion either. When Marilyn's appeal first reached this Court, her motion for extension of time to file her notice of appeal was still pending and unresolved. The record contained no order that would allow Marilyn to file her notice of appeal past the thirty day deadline set forth in M.R.A.P. 4. "Timely notice of appeal is jurisdictional." Curry v. B.C. Rogers Poultry, Inc., 797 So.2d 265(¶ 11) *675 (Miss.Ct.App.2001) (citing Bank of Edwards v. Cassity Auto Sales, Inc., 599 So.2d 579, 582 (Miss.1992)).
¶ 15. We notified the circuit court that it had not resolved Marilyn's motion for extension of time to appeal. In response to our request for resolution, the circuit court granted Marilyn's motion for extension of time. M.R.A.P. 4(g) allows a trial court to grant an aggrieved litigant an extension of thirty days to file a notice of appeal if the litigant files a timely motion for extension of time and shows good cause. Consequently, Marilyn's notice of appeal is timely. As such, Marilyn's appeal is before this Court. We turn to her issues on appeal.

II. Sufficiency and Weight of the Evidence
¶ 16. As will become abundantly clear, all six issues on appeal are intertwined. Marilyn's first three issues implicate the sufficiency of the evidence. A motion for directed verdict, a request for peremptory instruction, and a motion for JNOV all challenge the legal sufficiency of the evidence. Johnson v. State, 642 So.2d 924, 927 (Miss.1994). Technically, we are required to review the evidence and the ruling on its sufficiency as of the time the last challenge was made in the trial court. Id. Marilyn last challenged the sufficiency of the evidence in her motion for JNOV. As this analysis will show, the circuit court erred when it declined to grant Marilyn's request for a peremptory instruction that William was negligent and when it overruled her motion for a directed verdict. However, the circuit court did not necessarily err when it overruled Marilyn's motion for JNOV.
¶ 17. The granting of a motion for JNOV under M.R.C.P. 50(b) operates to terminate the case. C & C Trucking Co. v. Smith, 612 So.2d 1092, 1099 (Miss.1992). Because fact issues are present, ripe for jury resolution, the correct procedural device to cure the error we detect is to grant a new trial under M.R.C.P. 59(a). This remedy will permit the jury to apportion comparative negligence, if any, by Marilyn and to quantify Marilyn's damages.
¶ 18. Marilyn accused William of negligence in operating his vehicle. A prima facie case of negligence involves "duty or standard of care, breach of that duty or standard, proximate causation, and damages or injury." Lyle v. Mladinich, 584 So.2d 397, 398-99 (Miss.1991).
¶ 19. The driver of a motor vehicle owes an invited passenger the duty to exercise reasonable care in the operation of his vehicle. Hatcher v. Daniel, 228 Miss. 196, 206, 87 So.2d 490, 492 (1956). Further, the driver of a vehicle must not unreasonably expose an invited passenger to danger of an injury by increasing the hazard of travel. Id. What is more, a driver has the duty to take notice of an obvious danger and to take reasonable steps to avoid an accident or injury to persons or property after he has knowledge of the danger. Barkley v. Miller Transporters, Inc., 450 So.2d 416, 419-20 (Miss.1984).
¶ 20. William and Marilyn were the only two eyewitnesses to the accident. Marilyn claimed that William breached his duty to her when he fell asleep and lost control of his car. As mentioned, William admitted that he fell asleep at the wheel in that he characterized his loss of control over his car to the fact that he "passed out," or was otherwise "unconscious" at the time his car left the road. To be sure, William did not challenge Marilyn's version of events. Instead, William claimed that it was Marilyn's fault that he lost control of his car because she failed to accept his offer to drive.
*676 ¶ 21. At trial, William testified that he asked Marilyn to drive and that she refused. Marilyn testified just the opposite. Marilyn testified that she offered to drive but William refused. In any event, William testified that he felt he could "come on in" to Greenvillemeaning he could continue to drive, albeit in his sleepy and drowsy condition. William draws much attention to the fact that Marilyn filed her nails after she refused, but the fact that she refused is much more relevant than what she did afterwards. According to William, "[t]he jury . . . found that [Marilyn] was negligent (for not driving when [William] requested, or not taking measures to help him stay alert and awake or for continuing to ride with him under the circumstances) and that her negligence was the sole proximate cause of the accident and her injury."
¶ 22. William's principal defense to Marilyn's claim resembles the doctrine of assumption of risk. William claims that Marilyn, knowing of his sleepiness and nodding off while at the wheel and then refusing his request to assume the duties of a driver, voluntarily placed herself in a position of peril. The Mississippi Supreme Court has abolished the defense of assumption of risk as an absolute bar to a plaintiff's claim. See Churchill v. Pearl River Basin Dev. Dist., 757 So.2d 940(¶ 12) (Miss.1999) (holding "that the assumption of risk doctrine is subsumed into comparative negligence. Any actions which might constitute an assumption of risk should be dealt with only in the context of the comparative negligence doctrine.") Accordingly, such issues are comparative negligence issues ripe for jury resolution.
¶ 23. William submits that Mississippi precedent illustrates that, under certain circumstances, a driver's negligence can become negligence by the passenger.[3] William directs us to Chapman v. Powers, 150 Miss. 687, 116 So. 609 (1928). In Chapman, a plaintiff was a passenger in a car driven by her husband. The plaintiff's husband drove into a pile of gravel. The plaintiff sued the paving contractor responsible for the gravel. A jury returned a verdict in favor of the plaintiff and awarded $500 in damages. The plaintiff appealed and claimed the damages award was inadequate and that it evidenced prejudice and passion by the jury. The Chapman court affirmed and, in so doing, made the following statement:
[T]he jury could have found, and many have found, from the evidence, that a large part of the negligence proximately contributing to [the plaintiff's] injuries was her own negligence in riding in a car, between eleven and twelve at night, driven by her husband, who was in such a drunken condition as to render him unfit to drive the car with reasonable care and skill. Although the general rule is that a guest in an automobile is not chargeable with the negligence of his host, it is also true that the facts and circumstances may be such that the negligence of the host may become the negligence of the guest. If it is manifest that the host, from drunkenness, or other cause, is unfit to drive the car, and that his driving will endanger the life and limbs of others, and the guest is aware of that condition of affairs, and voluntarily rides in the car with such a host, the negligence of the latter becomes the negligence of the guest.
Id. 150 Miss. at 694, 116 So. at 611.
¶ 24. William also relies on Hill v. Dunaway, 487 So.2d 807 (Miss.1986). In that case, a passenger sued a driver after the driver crashed into a ditch. A jury returned a verdict for the passenger in the *677 amount of $50,000. The passenger, Hill, appealed and claimed the damages award was grossly inadequate.
¶ 25. On appeal, the passenger claimed that the trial court erred when it gave a comparative negligence instruction. The Hill court affirmed the trial court and stated:
In our view this instruction correctly states the law and was amply supported by the evidence. The record reflects that Plaintiff Hill, immediately prior to the accident, was aware that Dunaway had been drinking beer for a considerable period of timeeven assuming that Dunaway had had nothing to drink for the past hour. Further, Hill knew that a few minutes previously Dunaway had almost fallen asleep and had swerved off onto the shoulder of the road. From this evidence a jury may reasonably have concluded that Dunaway's extensive beer consumption or sleepiness, or the two in combination, presented a danger. A jury could further reasonably have concluded that Hill knew or should have known of these dangers, singly or in combination, and that knowing of these things, decided to take his chances. Well within the evidence was a jury conclusion that Hill's omissions constituted a failure to exercise ordinary and reasonable care for his own safety which may well have contributed to his injury.
Hill, 487 So.2d at 809.
¶ 26. True enough, precedent indicates that a passenger may incur comparative negligence when they are aware of a danger involving a driver's continued operation of a vehicle, yet do nothing to mitigate their risk. Still, the precedent indicates that such a passenger's negligence is comparative only, meaning that the driver may be negligent at the same time. This is not a new concept.
There are few agencies more fraught with danger to life and property than an automobile proceeding at a high rate of speed along a highway covered with loose gravel, without the direction of a conscious mind; and the fact that one continues to drive an automobile at a high rate of speed after he recognizes and appreciates signals of the near approach of sleep furnishes a proper basis from which an inference of negligence may be drawn.
Gower v. Strain, 169 Miss. 344, 352, 145 So. 244, 246 (1933).
¶ 27. Unlike Chapman or Hill, the jury in this case returned a verdict for William and attributed one hundred percent of the negligence to Marilyn. We find that the evidence in this case is insufficient to support the jury's verdict. The jury's verdict is against the substantial, overwhelming weight of the evidence and evinces bias, passion, and prejudice. We know of no legal requirement that Marilyn was obligated to take the wheel of William's car. No reasonable or fair-minded juror could find that, because Marilyn refused to drive William's car, Marilyn was the sole proximate cause of her injuries. To conclude such is to completely ignore William's own behavior in refusing to stop his car when he knew he was too ill or sleepy to drive. While it is the jury's province to determine where William's negligence ends and Marilyn's begins, to say Marilyn is one hundred percent negligent and William not at all negligent is entirely inconsistent with the evidence.
¶ 28. We hold as a matter of law that William was negligent in the operation of his vehicle. Whether Marilyn's damages were solely caused by William's negligence or were caused by the combined negligence of William and Marilyn is a proper issue for jury resolution.
*678 ¶ 29. The dissent would find that William was one hundred percent negligent and that his negligence was the sole cause of Marilyn's injuries. Consequently, the dissent would remand for a new trial on damages only. According to the dissent, "there is no evidence that William was in any way unfit to drive when he and Marilyn left Greenville for the trip to Lake Providence, Louisiana."
¶ 30. The dissent is correct that there is no evidence that, at the time William and Marilyn left Greenville, William was in any way unfit to drive. However, there certainly is evidence in the record that, after the layover in Lake Providence, Marilyn got back in the car with William after William's driving had indicated he may be too sleepy or unfit to make the return trip. The dissent quotes portions of William's testimony. However, portions of Marilyn's testimony indicate that Marilyn knew that something was wrong with William and that he may have been unfit to drive during the trip to Lake Providence as well as during the return trip to Greenville. Marilyn's testimony is central to the resolution of whether to remand for an entirely new trial or to find, as a matter of law, that William was solely negligent which would necessitate that we remand for a new trial on damages only.
¶ 31. As mentioned, Marilyn testified that, on both the trip to Louisiana to cash in the lottery tickets and the return trip to Greenville, William appeared to fall asleep at the wheel. She testified that William's breathing changed and that he veered or drifted off to either side of the road. The dissent recognizes William's testimony that he "got kind of dozy" on the return trip to Greenville. Accordingly, there is no dispute that, during the return trip, William behaved in a manner that suggested he was unfit to drive. However, we face a dispute in testimony as to what transpired as a result of William's sleepy behavior. William testified that he asked Marilyn to drive and that she refused. Marilyn testified that she asked William to let her drive and that he refused.
¶ 32. "A motion for new trial should only be granted when the entire evidence, viewed in the light most favorable to the non-moving party, leaves the trial judge with a firm and a definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice." Hopkins v. Schaeffer, 840 So.2d 737(¶ 6) (Miss.Ct.App.2003). In the light most favorable to William, a hypothetical juror could find that Marilyn was aware of William's drowsy condition and, despite William's request, Marilyn refused to drive and continued as a guest passenger in a vehicle being operated by a driver about to fall asleep at the wheel. According to established precedent, by refusing to drive it is possible that a jury could find that Marilyn was responsible, in some degree, for her own injuries. Though this opinion is in no way suggestive as to the outcome of this matter on remand, it is certainly reasonable that a jury may find William entirely at fault for Marilyn's injuries. However, based on our standard of review and the circumstances described in both William and Marilyn's testimony, it is for the jury to consider apportioning liability and resulting damages, if any, not this Court.
¶ 33. The proper approach would have been to instruct the jury that William was negligent as a matter of law and then allow the jury to consider and determine by proper instructions whether William was solely negligent or whether Marilyn was comparatively negligent. See Choctaw Maid Farms v. Hailey, 822 So.2d 911(¶ 11) (Miss.2002). If the jury found Marilyn bore some degree of comparative negligence, the jury should have then *679 found to what degree. Id. The jury should have determined Marilyn's total damages and reduced her damages based upon her degree of comparative negligence, if any, all under proper instructions from the court. Id.
¶ 34. Instruction D-2 stated, in pertinent part:
Therefore, if you find by a preponderance of the evidence that Marilyn Busby was a passenger in the vehicle being driven by William Burnley and that due to the circumstances then and there existing, Ms. Busby knew and appreciated that Mr. Burnley was unfit to drive the car and that she was fully aware of this and she chose to voluntarily ride in the car despite such knowledge, then if you find that Mr. Burnley was negligent and that said negligence resulted in the accident in question, then you also must consider whether or not Ms. Busby was negligent, and whether her negligence, if any, contributed to the accident.
(emphasis added). The jury should have never been allowed to consider that William was not negligent. The uncontradicted proof showed that he was negligent.
¶ 35. A peremptory instruction that William was negligent and his negligence was a proximate contributing factor to Marilyn's injury, such as the instruction in question in issue one, was proper. A directed verdict that the jury return a verdict for Marilyn would have also been proper. The circuit court did neither. It is the trial judge's duty to properly instruct the jury on controlling principles of Mississippi law. Fielder v. Magnolia Bev. Co., 757 So.2d 925(¶ 10)(Miss.1999)(holding instructions must fairly announce the law of the case and create no injustice).
¶ 36. Given the circumstances, the actual proper procedural vehicle to correct this error is a new trial. On retrial, the jury can be guided by proper instruction on apportionment of negligence, with at least some negligence attributable to William, as well as on the issue of damages. "A motion for a new trial seeks to vacate a judgment on grounds related to the weight, not sufficiency, of the evidence." Verner v. State, 812 So.2d 1147(¶ 6) (Miss.Ct.App.2002). A new trial should be granted when the jury has been confused by faulty jury instructions, the verdict is against the overwhelming weight of the evidence, or is based on bias, passion, or prejudice. Hamilton v. Hammons, 792 So.2d 956(¶ 44) (Miss.2001). "A motion for a new trial is addressed to the trial court's sound discretion." Fleming v. State, 732 So.2d 172(¶ 37) (Miss.1999). We may only reverse the circuit court's decision when we are convinced that the circuit court abused its discretion when it overruled Marilyn's motion for a new trial. Smith v. State, 868 So.2d 1048(¶ 11) (Miss. Ct.App.2004). We conclude the circuit court abused its discretion when it denied Marilyn's motion for a new trial.
¶ 37. Even in the light most favorable to William, there is no conflict over whether William fell asleep at the wheel. The overwhelming weight of the evidence indicated that William was negligent to some degree, whether solely or comparatively. A jury must resolve that question, as well as assessment of damages. Because the circuit court overruled Marilyn's motion for new trial, the circuit court abused its discretion. Accordingly, we reverse the circuit court and remand this matter for a new trial consistent with this opinion.
¶ 38. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
*680 KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CHANDLER, J.
IRVING, J., dissenting.
¶ 39. The majority finds the evidence sufficient to support a verdict of comparative negligence and remands for a new trial to determine whether Marilyn was guilty of contributory negligence in the accident that caused substantial injury to her. The majority also finds that William was negligent as a matter of law and directs that on remand the jury shall be so instructed. I agree that the record supports a finding that William was negligent as a matter of law and that the jury should be so instructed. However, my reading of the record convinces me that the majority errs in its assessment of the evidence regarding Marilyn's actions. Therefore, I respectfully dissent. I would find that William was 100 percent negligent and that his negligence was the proximate cause of Marilyn's injuries. Consequently, I would remand for a new trial on damages only.
¶ 40. The majority reasons that, based on William's statement that he asked Marilyn to drive and she refused, a jury could find that she contributed to causing the accident.[4] In my view, this reasoning is flawed. First, Marilyn was never in control of the vehicle; therefore, nothing that she did or refused to do could have caused the accident. To say that her refusal to drive may have caused or contributed to the accident is to say that her refusal to drive caused or forced William to continue to drive in a debilitated condition. Extending this reasoning further, one would have to conclude that Marilyn's refusal to drive left William with only one option: to keep driving. Even William does not make this claim. He says he kept driving because he felt like he could "come on in" to Greenville.
¶ 41. There is absolutely no evidence in this record to support a finding that William was in any way precluded from pulling his vehicle over to the side of the road and taking a nap or other measures to alleviate his drowsy condition. Suppose William had been traveling alone when he became sleepy or drowsy. Would he have been justified in continuing to drive because he had no one to assist him with the driving? Suppose further that he continued to drive, crossed the centerline, and collided head-on with an oncoming car, injuring the driver of that car. Could it be legitimately argued that, because he did not have anyone to help him drive, he would not be 100 percent liable for the injuries he caused? I think not. Therefore, it seems to me that when Marilyn refused to drive, William, as the operator of the vehicle, was required to do what any prudent driver should do when he finds himself getting sleepy at the wheel: pull over at the nearest rest stop and take a nap. Since he failed to do so, he, and he alone, must suffer the consequences, because it was he, and he alone, who made the decision to continue driving under the *681 mistaken belief that he could "come on in" to Greenville.[5]
¶ 42. The majority also makes conflicting and contradictory statements in its analysis of the evidence, and, in some instances, makes factual statements that are not supported by the record. For example, the majority says, "[t]o be sure, William did not challenge Marilyn's version of events." Majority Opinion at (¶ 20). The record clearly shows that William, in his trial testimony, contradicted Marilyn's testimony that he became sleepy, drifted across the centerline, and drifted off the edge of the road during the trip to Lake Providence, Louisiana. In fact, William's testimony was that he encountered no problems during the trip over to Lake Providence. Yet, the majority relies on Marilyn's testimonythat during the trip to Lake Providence, William dozed off at least twiceto conclude that a jury could find that Marilyn was guilty of contributory negligence by continuing to ride with William after it became clear to her that William was in no shape to continue driving. I find it illogical that the majority would make Marilyn's testimony the fulcrum of its rationale for concluding that a jury could find that Marilyn contributed to her own injuries by continuing to ride with William after she knew that his driving abilities had become impaired by sleep.[6] The illogicalness lies in the fact that William is the one who claims that Marilyn is contributively negligent, yet William denies that he became drowsy during the trip to Lake Providence. Notwithstanding Marilyn's testimony, it is distorted logic and bad jurisprudence to credit William with the beneficial legal consequences of incidents which he says never occurred. One cannot accept William's version, which is discussed below, of what transpired during the trip to Lake Providence and, at the same time, find that Marilyn was guilty of contributory negligence for continuing to ride with him.
¶ 43. Also, the majority's statement that "portions of Marilyn's testimony indicate that Marilyn knew that something was wrong with William and that he may have been unfit to drive during the trip to Lake Providence as well as during the return trip to Greenville" is a bit misleading, if not disingenuous, for it can be interpreted as meaning or subtly implying that Marilyn had knowledge of William's unfit state before leaving Greenville on the trip to Lake Providence.
¶ 44. Finally, it is inexplicable to me that the majority concludes that a jury could find that Marilyn was guilty of contributory negligence for refusing to accept William's request to drive, but at the same time, states that it "know[s] of no legal requirement that Marilyn was obligated to take the wheel of William's car. No reasonable or fair-minded juror could find that, because Marilyn refused to drive William's car, Marilyn was the sole proximate cause of her injuries." Majority Opinion at (¶ 27). It seems axiomatic to me that if there is no legal requirement that Marilyn was obligated to take the wheel of William's car, there can be no negligence on her part for not doing so.
*682 ¶ 45. The majority cites several cases in which the court held that a passenger's actions or inactions could be considered in calculating the passenger's entitlement to damages. In my judgment, none of the cases are applicable to the facts before us. In the first case cited, Chapman v. Powers, 150 Miss. 687, 116 So. 609 (1928), the passenger voluntarily got in a car being driven by her drunken husband, who drove into a pile of gravel. In affirming a meager jury award for the passenger, the Chapman court said: "If it is manifest that the host, from drunkenness, or other cause, is unfit to drive the car, and that his driving will endanger the life and limbs of others, and the guest is aware of that condition of affairs, and voluntarily rides in the car with such host, the negligence of the latter becomes the negligence of the guest." Id. at 694, 116 So. at 611. In our case, there is no evidence that William was in any way unfit to drive when he and Marilyn left Greenville for the trip to Lake Providence. As is discussed below, there also is no evidence that William was unfit to drive back to Greenville.
¶ 46. In the next case, Hill v. Dunaway, 487 So.2d 807, 809 (Miss.1986), the passenger was aware that the driver had been drinking beer for a considerable period of time prior to the accident which led to the passenger's injuries. Again, these facts are not our case. There is no evidence that William was engaged in any activities prior to the trip which would have caused Marilyn to know or reasonably believe that it was unsafe to travel with William. For sure, there is Marilyn's testimony that, during the trip to Lake Providence, William became drowsy or sleepy and that he again became drowsy or sleepy on the return trip. However, Marilyn testified that on each of these occasions she asked William to let her drive and he refused. William denied that these incidents occurred. The record reflects the following testimony by William on direct examination:
Q. On the trip to Lake Village or to Lake Providence, what problems, if any, did you have driving that you're aware of?
A. None that I'm aware of at all.
Q. You heard Ms. Busby say on the way over thereI can't remember whether it was between here and Lake Village or Lake Village and Lake Providencebut on the way over there that on one occasion that you had dozed off. Is that correct?
A. No, sir, that's not right.
¶ 47. On cross-examination, William continued to deny the instances of drowsiness or sleepiness about which Marilyn testified:
Q. And you also deny that Ms. Busbyyou also deny, the first thing, that you dozed off on the way to Lake Providence?
A. I certainly do.
Q. So, it's your testimony in front of the Jury here today, Mr. Burnley, that the only time you recall dozing off is one occasion? At some point prior to the accident. You don't know if it was immediately before, or it might have been two miles before?
A. That's exactly right.
¶ 48. I return to William's direct examination testimony, which undergirds the majority's rationale for finding an issue of fact regarding Marilyn's contributory negligence vel non. William's testimony is instructive:
Q. All right, after you ate lunch and you got your lottery tickets, tell me what happened then.
A. Weuhproceeded to return to Greenville, anduhwe were coming *683 up 65. Uhas we were approaching the Arkansas and Louisiana line, I got kind of dozy, and sheI think at that time she recognized that I was kind of sleepy, and she asked me. And I said, yes. Would you take the wheel? Would you drive?
Q. What did she say to you?
A. She said no, I'm going to do my fingernails. Anduhshe put her glasses on and proceeded to do her fingernails. And beyond that, the next thing I knew was a day or so later I was in the Delta Medical Center.
¶ 49. It is clear to me that, based on this evidence and the applicable law, no reasonable jury can find that Marilyn contributed to her injuries and damages. First, there is absolutely no evidence that Marilyn was negligent in choosing to accompany William on the trip. Second, based on William's testimony, there is no evidence to support a finding that during the trip to Lake Providence Marilyn became aware that William was impaired to the extent that it was unsafe for him to continue to drive. As I have already noted, William emphatically denied that he became sleepy or drowsy during the trip to Lake Providence and admitted to only one instance of sleepiness or drowsiness on the return trip prior to the accident. And as to that one instance, William could not say whether it occurred two miles up the road prior to reaching the spot where the accident occurred or whether it occurred immediately before the accident. More importantly, William did not say, with regard to the one instance of drowsiness, that he ran off the road or drifted across the centerline. He simply said that he "got kind of dozy." Therefore, it cannot be reasonably argued that, based on this one admitted incident by William, Marilyn possessed prior knowledge that William was in a condition that could lead to an accident and her subsequent injuries. All of the cases cited by the majority which hold that the passenger may have contributed to the passenger's injuries involved instances where there was no doubt that the driver was seriously impaired and the passenger knew for quite some time prior to the accident of the driver's impairment.
¶ 50. As I have already discussed, Marilyn's knowledge of William's unfitness to drive was acquired after, not before, she and William set out on their trip to Lake Providence. This is a major and significant fact which materially distinguishes this case from the cases cited by the majority. Further, William denied that Marilyn acquired any knowledge regarding his unfitness to drive during the trip to Lake Providence. As I have already pointed out, William said that he never became sleepy on the way to Lake Providence. However, even if I were to indulge the efficacy of the majority's reasoning that, despite Williams' denial, Marilyn's testimony should be held against her, I cannot accept that it is reasonable to hold that, when Marilyn first saw William doze, she was required to get out of the car on the roadside and expose herself to perhaps an even greater danger in order to avoid some liability. And, to predicate liability on the fact that she did not get out in Lake Providence, where arguably it was probably safer to do so, is to overlook that they arrived safely in Lake Providence, with no apparent indication that William was still struggling with sleepiness. Moreover, the stop in Lake Providence may well have had the effect of reviving William to the point that his alertness was no longer an issue. To hold that Marilyn was potentially negligent for not getting out of William's car in Lake Providence is to assume that William was unfit to drive when they left Lake Providence and that Marilyn was *684 aware of that fact. The record does not support a finding that William was still suffering from sleepiness when he and Marilyn left Lake Providence and began the return trip home. It would be pure conjecture and speculation to conclude otherwise. That he did in fact later become sleepy does not prove that he was sleepy when he left Lake Providence. A jury cannot base its verdict on conjecture and speculation.
¶ 51. For the reasons presented, I respectfully dissent. I would remand this case for trial as to damages only.
CHANDLER, J., JOINS THIS OPINION.
NOTES
[1] The record contains a notice of hearing. According to that notice of hearing, the circuit court heard Marilyn's posttrial motions on August 24, 2000.
[2] Posttrial, William died from causes unrelated to this accident. The executrix of his estate was substituted as the defendant.
[3] William's cited authority all predate Churchill.
[4] The majority does not make entirely clear the basis for its finding that a jury could potentially find that Marilyn contributed to her damages. It discusses both Marilyn's testimony that she requested to drive during the trip over to Lake Providence, Louisiana and William's testimony that Marilyn refused his request to assist with the driving during the return trip. It appears that the majority reasons that a jury could fault Marilyn for her actions and inactions during both the trip over and the trip back. In this dissent, I address the legal impact of her actions and inactions which occurred during the entire trip.
[5] I am aware that the ultimate issue is whether Marilyn committed or omitted an act which may have contributed to her injuries as opposed to the accident. However, on these facts that is a distinction without a difference because the act that is alleged to give rise to her negligence and subsequent injuries is the act of refusing to drive.
[6] See Majority Opinion at (¶ 30), finding that "Marilyn's testimony is central to the resolution of whether to remand for an entirely new trial or to find, as a matter of law, that William was solely negligent which would necessitate that we remand for a new trial on damages only."